[L.A. No. 31706. Nov. 25, 1983.]

IT CORPORATION, Plaintiff, Cross-defendant and Appellant, v.
COUNTY OF IMPERIAL,
Defendant, Cross-complainant and Respondent.

64

**COUNSEL**

Gibson, Dunn & Crutcher, Charles C. Ivie, Willard K. Halm, David M. Houston-Reeve, Patrice I. Kopistansky, Deborah S. Feinerman, Horton, Knox, Carter & Foote, Orlando B. Foote and Frank A. Oswalt III for Plaintiff, Cross-defendant and Appellant.

James H. Harmon, County Counsel, Latham & Watkins, David L. Mulliken and Hayden J. Trubitt for Defendant, Cross-complainant and Respondent.

Adrian Kuyper, County Counsel (Orange), and John R. Griset, Deputy County Counsel, as Amici Curiae on behalf of Defendant, Cross-complainant and Respondent.

OPINION

**BIRD, C. J.**—What is the proper test for issuance of a preliminary injunction when a governmental entity seeks to enjoin an alleged violation of a zoning ordinance which specifically provides for injunctive relief?

## I.

IT Corporation (IT), is a firm specializing in the transportation and management of hazardous wastes. On July 18, 1979, IT applied to the County of Imperial (County), for a conditional use permit (CUP) to construct and operate a hazardous waste disposal facility. The proposed location for the facility was a 640-acre site known as Superstition Hills. In its application for the CUP, IT indicated that it planned to dispose of "toxic substances" and "geothermal wastes" at the facility. IT also sought an amendment to the County's general plan and a zoning change to permit development of the proposed project.

On September 4, 1979, IT first presented the Superstition Hills project to the County's board of supervisors (Board) at their regular meeting. IT representatives and the Board discussed several aspects of the project. The Board was informed that the facility would be similar to another "strictly geothermal" site which IT was currently operating in Lake County.

Subsequently, the County hired outside consultants to prepare an environmental impact report (EIR) pursuant to the requirements of the California Environmental Quality Act. Issued in April of 1980, the EIR described the areas to be serviced by the Superstition Hills facility and the nature of the wastes to be processed at the site. The EIR explained that while the project was initially proposed to meet the needs of geothermal and agricultural industries, IT also intended to process wastes from "other industrial sources."

On July 23, 1980, IT issued a draft of its operations plan. The plan stated that the project would process wastes from "other industrial sources" as well as those generated by agricultural and geothermal industries. In addition, the plan contained a "laundry list" of the specific wastes IT anticipated receiving from these "other industrial sources."

In the spring and summer of 1980, both the Board and the County's planning commission held hearings on IT's requested amendment of the County's general plan and zoning laws. These amendments were approved on May 20, 1980, and July 1, 1980, respectively.

The planning commission also held a hearing on IT's application for a CUP. On August 13, 1980, the planning commission approved issuance of the CUP, authorizing IT to construct and operate the Superstition Hills site "for the disposal of geothermal waste, pesticide containers and other Class I materials[1] . . . as described in the application, the Final Environmental Impact Report . . . and the operation plan . . . ." The CUP was issued to IT on September 17, 1980. Among the various general and specific conditions included in the CUP was that IT "comply with all applicable laws and regulations" and "secure all necessary permits."

After securing the requisite permits, IT began operating the Superstition Hills facility on December 18, 1980. Allegedly, not only were geothermal and pesticide wastes processed but also a number of other general heavy industrial wastes.

Shortly thereafter, the County began to informally investigate the nature of the wastes being processed at the facility. On January 13, 1981, the Board adopted a "Resolution Regarding Conditional Use Permit Issued to IT Corporation." The resolution noted a possible ambiguity in the terms of the CUP. Both the planning director and the CUP application indicated that the CUP pertained "only to geothermal wastes and wastes generated by the pesticide application industry." However, the EIR and IT's operation plan "appear[ed] to refer to disposal of other types of wastes."

Accordingly, the planning commission was requested to conduct a hearing "to clarify any possible ambiguity in the permit relative to the types of wastes which may be received at the IT site." The resolution also affirmed that importation of solid wastes from outside the County for disposal at the site was prohibited by County ordinance.[2] In addition, the planning director was requested to conduct an investigation to determine whether wastes had been processed at the site in violation of the permit and, if appropriate, to issue a notice of violation.

---

[1] "Class I materials" refers to those waste materials which the State Water Resources Control Board has determined may be disposed of only in "Class I sites," or, under certain circumstances, in "Class II-1 sites." (Cal. Admin. Code, tit. 23, §§ 2531-2533.) These "Group I wastes" consist of or contain "toxic substances" and substances which "could significantly impair" water quality. They include not only agricultural and geothermal wastes but also many other wastes from municipal and industrial sources. (Id., § 2520.)

[2] In August 1979, the Board had adopted Ordinance No. 701 which contained the following provisions: "(1) It shall be unlawful for any person or firm to import or cause to be imported into the county any solid wastes originating outside the county for the purpose of placing, dumping, or disposing of the same within the county. [¶] (2) It shall be unlawful for any person who is not an inhabitant of the county to bring to, deposit in or upon any county disposal facility, any solid wastes."

This ordinance was subsequently renumbered section 57300, Codified Ordinances of Imperial County.

On January 19, 1981, IT received notice from the County of a public hearing "to clarify ambiguities in the permit issued to IT Corporation." The hearing was scheduled for January 28, 1981.

Two days prior to the scheduled hearing, IT filed a complaint against the County for injunctive and declaratory relief. The lawsuit sought to prevent the County from either modifying or revoking the CUP, or enforcing its anti-importation ordinance. IT stated in its complaint that the CUP "clearly establish[ed]" that IT was authorized to process not only geothermal and pesticide wastes but all hazardous waste materials listed in the EIR and the operations plan. It was further alleged that the County's restriction on importation of hazardous wastes from other counties was unenforceable because it violated both the federal Constitution and state law.

On February 12, 1981, the County filed a cross-complaint against IT, seeking injunctive and declaratory relief from IT's alleged violation of the CUP.[3] The cross-complaint stated that the CUP authorized IT to dispose of only geothermal and pesticide wastes at the site. The County further alleged that it was suffering irreparable harm from IT's violation of the CUP and that the County could not be fully compensated for this harm by an award of damages.

Hearings on the County's motion for preliminary injunction were held on nine different days during the months of May, June, and July.

In August, the trial court issued its findings and order. First, the court found that, contrary to the contentions of both parties, the terms of the CUP were ambiguous. As a result, extrinsic evidence was considered to construe the terms of the CUP. Based on this evidence, the court found that the CUP "must be construed to restrict disposal of waste types to geothermal wastes, pesticide containers, wastes related to these specified [materials,] and wastes resulting from emergency spills." Lastly, the trial court found that IT was using the site to dispose of wastes not permitted by the CUP. Accordingly,

---

[3]The Codified Ordinances of the County of Imperial specifically provide an injunctive remedy for violation of its zoning laws. Section 83502 provides in pertinent part: "[A]ny use of property contrary to the provisions of this Division shall be, and the same is hereby declared to be unlawful and a public nuisance, and the authorized legal representative of the County of Imperial shall immediately commence actions and proceedings for the abatement . . . thereof, in the manner provided by law; and shall take such other steps and shall apply to any court as may have jurisdiction to grant such relief as will abate or remove such . . . use and restrain and enjoin any person, firm or corporation from . . . using any property contrary to the provisions of this Division."

Section 83503 provides in pertinent part: "This Division may also be enforced by injunction issued out of the Superior Court upon the suit of the County or the owner or occupant of any real property affected by such violation or prospective violation."

the court issued a preliminary injunction restraining IT from disposing of any unauthorized wastes at Superstition Hills.

IT sought review and this appeal followed.[4]

## II.

The principal question raised by this appeal concerns the proper standard for the issuance of a preliminary injunction when a governmental entity seeks to enjoin an alleged violation of a zoning ordinance which specifically provides for injunctive relief.

■■■ The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889]; *People* v. *Black's Food Store* (1940) 16 Cal.2d 59, 61 [105 P.2d 361]; *People* v. *Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 304, 309 [151 Cal.Rptr. 757].) As this court explained in *People* v. *Black's Food Store, supra,* 16 Cal.2d at page 61, "The authorities are numerous and uniform to the effect that the granting or denial of a preliminary injunction on a verified complaint, together with oral testimony or affidavits, even though the evidence with respect to the absolute right therefor may be conflicting, rests in the sound discretion of the trial court, and that the order may not be interfered with on appeal, except for an abuse of discretion. [Citations.]"

■■■ A trial court will be found to have abused its discretion only when it has " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " (*Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 527, quoting *Estate of Parker* (1921) 186 Cal. 668, 670 [200 P. 619]; *California State University, Hayward* v. *National Collegiate Athletic Assn.* (1975) 47 Cal.App.3d 533, 544 [121 Cal.Rptr. 85].) ■■■ Further, the burden rests with the party challenging the injunction to make a clear showing of an abuse of discretion. (*Socialist Workers etc. Committee* v. *Brown* (1975) 53 Cal.App.3d 879, 889 [125 Cal.Rptr. 915]; *People* v. *Gordon* (1951) 105 Cal.App.2d 711, 723 [234 P.2d 287]; *Remillard Brick Co.* v. *Dandini* (1941) 47 Cal.App.2d 63, 68 [117 P.2d 432].)

■■■ This court has traditionally held that trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to

---

[4]By the time IT filed its appeal, the County had repealed its anti-importation ordinance. The legality of the ordinance is, therefore, no longer at issue.

sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. (*Weingand* v. *Atlantic Sav. & Loan Assn.* (1970) 1 Cal.3d 806, 820 [83 Cal.Rptr. 650, 464 P.2d 106]; *Continental Baking, supra,* 68 Cal.2d at p. 528; see also, *Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 799, fn. 1 [150 Cal.Rptr. 867, 587 P.2d 663] (conc. opn. of Bird, C. J.).) In *Continental Baking,* this court explained the theory behind this two-pronged test: " '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' " (*Continental Baking, supra,* 68 Cal.2d at p. 528, quoting *Miller & Lux* v. *Madera Canal etc. Co.* (1909) 155 Cal. 59, 62-63 [99 P. 502].)

This court has not addressed the question as to whether this two-factor test is the proper rule to apply when a governmental entity seeks to enjoin an alleged violation of a zoning ordinance which provides for injunctive relief.

IT contends that the injunction was erroneously issued because the trial court did not balance the relative hardships to the parties. The County, however, maintains that if a governmental entity seeks to enforce zoning laws which specifically provide for injunctive relief, it need not make a showing of actual harm nor prevail in a balancing of harms to obtain a preliminary injunction.

Each position has some merit. The County properly points out that once a trial court has determined that the governmental entity will probably succeed at trial in proving a statutory violation, the court is justified in presuming that public harm will result if an injunction is not issued. The reasoning underlying this argument is sound. Where a legislative body has enacted a statutory provision proscribing a certain activity, it has already determined that such activity is contrary to the public interest. Further, where the legislative body has specifically authorized injunctive relief against the violation of such a law, it has already determined (1) that significant public harm will result from the proscribed activity, and (2) that injunctive relief may be the most appropriate way to protect against that harm. (See *Paul* v. *Wadler* (1962) 209 Cal.App.2d 615, 625 [26 Cal.Rptr. 341].)

Indeed, courts of this state have upheld preliminary injunctions issued against alleged law violations in a variety of statutory contexts without expressly balancing the actual harms to the parties. (See, e.g., *People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, 21-23 [141 Cal.Rptr. 20, 569 P.2d 125] [although the court recited the *Continental Baking* test which includes a balancing of harms, it did not mention the relative harms in its

evaluation of the facts; instead, it based its holding solely on the reasonable probability of success on the merits]; *People* v. *Columbia Research Corp.* (1977) 71 Cal.App.3d 607, 610-612 [139 Cal.Rptr. 517], cert. den., 434 U.S. 904 [54 L.Ed.2d 191, 98 S.Ct. 302]; *City of Los Angeles* v. *Silver* (1979) 98 Cal.App.3d 745, 750-751 [159 Cal.Rptr. 762].) In each case, the plaintiff was a governmental entity seeking to enjoin an alleged violation of its laws. In each case, the appellate court concluded that the plaintiff's showing that it would prevail on the merits was sufficient to warrant injunctive relief.

Federal courts have also affirmed orders granting statutory injunctive relief without balancing actual harms. (See, e.g., *Atchison, T. & S. F. Ry. Co.* v. *Lennen* (10th Cir. 1981) 640 F.2d 255, 258-259; *Seeler* v. *Trading Port, Inc.* (2d Cir. 1975) 517 F.2d 33, 36-40; *American Fruit Growers* v. *United States* (9th Cir. 1939) 105 F.2d 722, 725; *Securities and Exchange Commission* v. *Torr* (2d Cir. 1937) 87 F.2d 446, 450.) In *Atchison, supra,* 640 F.2d 255, the court of appeals explained the rationale behind this implicit presumption of public harm. In that case, the court reversed an order denying a preliminary injunction which had been sought to prevent an alleged violation of the Revised Interstate Commerce Act. The district court had based its denial on, inter alia, plaintiffs' failure to show that they would probably suffer greater injury from the alleged violation than that which the defendant would probably suffer from the proposed injunction.

In rejecting the lower court's reasoning, the court in *Atchison* explained that the trial court "is to be guided by the primary objectives of the statute involved . . . ." (*Id.,* at p. 258.) By prohibiting the proscribed activity and specifically authorizing enforcement by injunction, Congress had expressed its intent to prevent the public harm it impliedly determined this conduct would cause. The trial court had found that " 'plaintiffs will probably prevail on the merits.' " (*Id.,* at p. 260.) Consequently, in light of the "specific and clear" authorization by Congress to issue an injunction to prevent, restrain or terminate violations of the act, the court of appeals held that the preliminary injunction should have been issued on the basis of the trial court's finding alone. (*Id.,* at p. 258.)

Accordingly, the County is correct that where a legislative body has specifically provided injunctive relief for a violation of a statute or ordinance, a showing by a governmental entity that it is likely to prevail on the merits should give rise to a presumption of public harm.

On the other hand, IT is correct that an important function of preliminary injunctions—that of preventing serious interlocutory harm to the ultimately successful party—would be thwarted if an *irrebuttable* presumption in favor

of the governmental entity were created. A conclusive presumption would fail to protect those defendants who might suffer grave or irreparable immediate harm from the issuance of an injunction even where that harm far outweighs the harm the public might suffer if no injunction were issued. To provide the requisite protection, IT argues, the court must consider, at least to some extent, the relative harms to the parties. In support of its position, IT cites cases in which courts have balanced the relative harms to the parties despite allegations by governmental entities that statutory violations are occurring. (*State Bd. of Barber Examiners* v. *Star* (1970) 8 Cal.App.3d 736 [87 Cal.Rptr. 450]; see also *Benda* v. *Grand Lodge of Intern. Ass'n etc.* (9th Cir. 1978) 584 F.2d 308, cert. dism. (1979) 441 U.S. 937 [60 L.Ed.2d 667, 99 S.Ct. 2065]; *Socialist Workers etc. Committee* v. *Brown* (1975) 53 Cal.App.3d 879 [125 Cal.Rptr. 915].)

It is apparent from the case law and from the considerations underlying the parties' arguments that the purposes of a preliminary injunction are best served in the present circumstances by an adaptation of the traditional test which incorporates elements of both parties' positions. Once a governmental entity establishes that it will probably succeed at trial, a presumption should arise that public harm will result if an injunction does not issue. However, some consideration must be given to the harm likely to be suffered by the defendant where that harm is alleged to be grave or irreparable.

▆▆▆ Accordingly, the propriety of an injunction must be judged by the following standard. Where a governmental entity seeking to enjoin the alleged violation of an ordinance which specifically provides for injunctive relief establishes that it is reasonably probable it will prevail on the merits, a rebuttable presumption arises that the potential harm to the public outweighs the potential harm to the defendant.[5] If the defendant shows that it would suffer grave or irreparable harm from the issuance of the preliminary injunction, the court must then examine the relative actual harms to the parties.

Once the defendant has made such a showing, an injunction should issue only if—after consideration of both (1) the degree of certainty of the outcome on the merits, and (2) the consequences to each of the parties of granting or denying interim relief—the trial court concludes that an injunction is proper. At this stage of the analysis, no hard and fast rule dictates which consideration must be accorded greater weight by the trial court. For example, if it appears fairly clear that the plaintiff will prevail on the merits,

---

[5]In its discussion of *City of Los Angeles* v. *Silver, supra,* 98 Cal.App.3d 745, IT concedes that the clearer the violation, the less the trial court need be concerned with the balancing of harm. This point implicitly acknowledges the reasonableness of the rule adopted here.

a trial court might legitimately decide that an injunction should issue even though the plaintiff is unable to prevail in a balancing of the probable harms. On the other hand, the harm which the defendant might suffer if an injunction were issued may so outweigh that which the plaintiff might suffer in the absence of an injunction that the injunction should be denied even though the plaintiff appears likely to prevail on the merits.

■ The ultimate goal of any test to be used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause. (See Leubsdorf, *The Standard for Preliminary Injunctions* (1978) 91 Harv.L.Rev. 525, 541.) ■ (See fn. 6.) This important function is well served by application of the principles set forth above.[6]

■ Evaluating the trial court's action in light of this test, this court concludes that the trial court did not abuse its discretion in granting the preliminary injunction. The County demonstrated a reasonable probability it would prevail in establishing a violation of the CUP. The trial court reasonably concluded that the CUP issued by the County permitted only geothermal wastes, agricultural wastes, and wastes generated by emergency spills to be processed at Superstition Hills. Further, the evidence supports

---

[6]A similar test was adopted in a closely analogous factual context in *People* v. *Synanon Foundation, Inc., supra,* 88 Cal.App.3d 304. In that case, the trial court had issued a preliminary injunction enjoining the operation of an airport. The airport was allegedly being operated in violation of a local zoning ordinance which provided that a violation was a public nuisance per se.

In reviewing the issuance of the injunction, the *Synanon Foundation* court applied a test similar to that articulated here but a more stringent standard of "clear showing" of eventual success on the merits gave rise to a conclusive presumption of greater public harm. Applying the test to the facts of that case, the court found that the plaintiff had not made a clear showing of an ordinance violation. Therefore, it concluded, the trial court had abused its discretion in issuing the injunction without balancing the relative harm to the parties.

Although the *Synanon Foundation* rule properly presumes public harm in this factual context if the requisite showing of a violation is made, its "clear showing" standard is too stringent. Requiring a clear showing of success on the merits at the preliminary injunction stage imposes virtually the same standard of proof on the party seeking injunctive relief as that which must later be met at trial. As this court has repeatedly held, a preliminary injunction hearing is not a trial on the merits. (*Weingand* v. *Atlantic Sav. & Loan Assn., supra,* 1 Cal.3d at p. 820; *Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 528; accord *Socialist Workers etc. Committee* v. *Brown, supra,* 53 Cal.App.3d at p. 887.) Since the relief sought is "preliminary" only, a less rigorous "reasonable probability" standard is more appropriate.

Further, the conclusive presumption adopted by the court in *Synanon Foundation* inadequately protects defendants who may ultimately succeed at trial from the severe or irreparable harm which a preliminary injunction may cause under certain circumstances. Although a presumption of public harm is proper once the requisite showing of success on the merits has been made, the impossibility of the presumption being rebutted fails to provide the flexibility necessary to ensure that serious harm to the defendant may be avoided.

Consequently, to the extent that the holding in *Synanon Foundation* is inconsistent with this case, it is disapproved.

the finding that IT was accepting other unauthorized wastes in violation of the CUP.[7]

Although the terms of the permit itself were ambiguous, the trial court reasonably found on the basis of the contents of the permit application and other documents generated during the permit issuance process that the CUP was limited in scope.

For example, the environmental information section of the CUP application specified that geothermal and pesticide application industries would be the major sources of wastes processed at the site. No other waste types were described in the "Project Description" summary of this section.

IT contends that the County was adequately notified of its intent to process other types of wastes by the inclusion in the EIR of a "laundry list" of wastes to be processed at the site. This list included many wastes other than those generated by geothermal and pesticide industries. However, Richard Mitchell, who, as County planning director, was primarily responsible for application review and permit drafting, testified at the preliminary injunction hearing (1) that the County understood this list to be a description of the facility's *future* disposal capabilities, and (2) that the Board believed IT would apply for another CUP before expanding its operations to include disposal of these additional wastes. Mitchell's testimony is supported by the fact that the EIR contained no analysis of the environmental impact of transporting, receiving, and processing these other wastes. Indeed, only geothermal and pesticide wastes were referred to in the executive summary of the EIR.

The testimony regarding the September 4, 1979, meeting between the parties and the April 23, 1980, hearing before the County planning commission further supports the County's position. At the September 4, 1979, meeting, the parties discussed the fact that the Superstition Hills site would be similar to IT's Lake County facility which was limited to the disposal of geothermal wastes. Further, Mitchell testified at the April 23, 1980, hearing before the planning commission that IT was seeking permission "to construct and operate a disposal site for geothermal waste and for pesticide containers." Dr. Michael Neinberg, who prepared the EIR, had also testified at that meeting. He, too, had referred to the proposed project as "strictly" for geothermal and pesticide waste processing.

---

[7]It should be emphasized that this court's review of the evidence supporting the issuance of the preliminary injunction is not a decision on the merits of the complaints filed by the parties. (*Weingand* v. *Atlantic Sav. & Loan Assn., supra,* 1 Cal.3d at p. 820; *Continental Baking, supra,* 68 Cal.2d at p. 528; *Socialist Workers etc. Committee* v. *Brown, supra,* 53 Cal.App.3d at pp. 887-888.)

There is also ample evidence in the record to support the trial court's conclusion that IT was receiving and processing wastes not authorized by the CUP at the Superstition Hills site. Mitchell testified that he had evaluated the types and quantities of wastes disposed of at the site during a two-month period of operation. He found that approximately 66 percent of these wastes were not from geothermal or pesticide industries.

Finally, IT contended that a CUP which authorized only the disposal of geothermal and pesticide wastes was unlawful. However, the trial court reasonably concluded that IT had only applied for a CUP which was so limited. The record fully supports the court's finding that IT has never sought authorization to process other types of wastes at the site. Consequently, this court need not decide whether the restrictions imposed upon the Superstition Hills facility were improper.[8]

The County demonstrated that it was reasonably probable that IT violated the CUP by processing materials other than geothermal and pesticide wastes at Superstition Hills. The trial court, therefore, correctly presumed that the County would suffer greater harm if the injunction were not issued than IT would suffer from the issuance of the injunction.

Furthermore, IT failed to make the requisite showing of grave or irreparable harm to rebut the presumption in favor of the County. Although issuance of the injunction would cause IT a substantial economic loss of waste disposal and transportation revenues, IT failed to show that the injunction would cause harm sufficient to constitute grave or irreparable injury. Even after issuance of the injunction, IT would still be able to process geothermal and pesticide wastes. There was no abuse of discretion in the trial court's issuance of the preliminary injunction.

### III.

The trial court's order enjoining IT from receiving and processing certain wastes unauthorized by the CUP is affirmed.

■ This court's affirmance of the preliminary injunction is not a decision on the merits of the complaints filed by the parties. (*Weingand* v. *Atlantic Sav. & Loan Assn.*, *supra*, 1 Cal.3d at p. 820; *Continental Baking, supra,* 68 Cal.2d at p. 528; *Socialist Workers etc. Committee* v. *Brown, supra,* 53

---

[8]In any event, County witnesses testified that various environmental considerations justified limiting the scope of IT's operation to processing only geothermal and pesticide wastes. County witnesses also testified that the restrictions contained in the CUP were not based on the geographical origins of waste materials. They explained that the CUP allowed the dumping of geothermal and pesticide wastes irrespective of their geographical origins.

Cal.App.3d at pp. 887-888.) A full hearing at trial is still required to adjudicate the ultimate rights in controversy here. Over two years have elapsed since the initial complaints were filed by these parties. Consequently, the trial court is encouraged to schedule this action for trial at the earliest possible date.

Mosk, J., Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.