Filed 6/26/13  Ingalsbee v. City of Burbank CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SHANNA INGALSBEE et al., | B244745 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS137238) |
| v. | |
| CITY OF BURBANK et al., | |
| Defendants and Appellants, | |
| WAL-MART STORES, INC., | |
| Real Party in Interest and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Robert O'Brien, Judge.  Reversed and remanded.

Law Office of Gideon Kracov, Gideon Kracov; Lozeau Drury, Richard T. Drury, Michael R. Lozeau and Christina M. Caro for Plaintiffs and Respondents Shanna Ingalsbee, Katherine Olson and Yvette Ziraldo.

Rutan & Tucker, M. Katherine Jenson, Peter J. Howell; City of Burbank City Attorney's Office, Amelia Ann Albano and Joseph H. McDougall for Defendants and Appellants City of Burbank, and City Council of City of Burbank.

Morgan, Lewis & Bockius, Rollin B. Chippey II, Thomas M. Peterson, and Deborah H. Quick for Real Party in Interest and Appellant Wal-Mart Stores, Inc.

_____

The City of Burbank (the City)[1] and Wal-Mart Stores, Inc. appeal a preliminary injunction in an action alleging the City issued building permits to Wal-Mart in violation of the California Environmental Quality Act (CEQA; see Pub. Res. § 21000 et seq.),[2] the Burbank Municipal Code, and a planned development ordinance adopted by the City. The action seeks mandamus and injunctive relief commanding the City to set aside the building permits until it complies with the law. The preliminary injunction prohibits construction activities under authority of the building permits pending trial.[3] We reverse the preliminary injunction.

## FACTS

### *Background*

The Empire Center is a commercial development, predominantly a shopping area, situated on a little more than 100 acres within the City's boundaries. The Empire Center development project was built during the early 2000s subject to a number of "Conditions of Approval" prescribed in an ordinance adopted by the City to approve what was known as "Planned Development No. 97-3." Among its provisions, the Planned Development No. 97-3 ordinance designates five "Sub Areas" within the Empire Center (A to E), each having specified permissible land uses. A permissible use in Sub Area D is a retail store, including a "big box" store; a use that is not permissible in Sub Area D is a grocery store.

Wal-Mart has proposed a project for a 142,000 square foot store in Sub Area D, including 30,000 square feet for grocery purposes within the overall store space. The proposed Wal-Mart store project would be constructed in an already existing building which was formerly occupied by a home furnishing store known as the Great Indoors. There is some local resistance to the proposed Wal-Mart store project.

---

[1]    Our references to the City generally include the City Council of the City of Burbank. Where necessary to for clarify facts, we expressly refer to the city council.

[2]    All further section references are to the Public Resources Code except as noted.

[3]    Trial is presently calendared to begin this month.

***The Empire Center Development Project***

In June 2000, the City adopted a resolution certifying the Environmental Impact Report (EIR) for the Empire Center development project as required under CEQA. The EIR for the Empire Center development project described mitigation measures to address the project's studied environmental impacts, including the impact on traffic. The traffic mitigation measures in the EIR were identified by number, 7.1 to 7.17 respectively. The EIR also described a Mitigation Monitoring Plan and Program (see § 21081.6) for the implementation and review of the mitigation measures for the Empire Center development project.

In September 2000, the City adopted Ordinance No. 3554, approving and adopting Planned Development No. 97-3 for the Empire Center development project. The Planned Development No. 97-3 ordinance prescribes a series of "Conditions of Approval" for the Empire Center development project, including a series of Traffic Mitigation Measures, numbers 7.1 to 7.17 respectively. Basically, the mitigation measures that were described in the informational EIR for the Empire Center development project were thereafter imposed on the project with the force and obligation of law by municipal ordinance. The Planned Development No. 97-3 ordinance generally assigns responsibility for implementing its prescribed Traffic Mitigation Measures to the City.

Traffic Mitigation Measure 7.1 provides: "*Concurrent with issuance of the first building permit . . . ,* the City['s] Public Works Director *shall have prepared and shall have begun implementing a roadway and intersection improvement program* to implement [Traffic] Mitigation Measures 7.1 through 7.14. The roadway and intersection improvement program *shall include a listing of improvements to be completed.* Such improvements *shall be fully implemented pursuant to the roadway and intersection improvement plan such that significant impacts are thereby avoided or mitigated below a*

*level of significance at the time of completion of the project, or shall be substantially complete, as defined in the Development Agreement.*"[4]  (Italics added.)

Traffic Mitigation Measure 7.2 for the intersection of Buena Vista Street and Victory Boulevard ("Intersection #17") states that the City "shall provide" two left turn lanes on the eastbound and southbound approaches.  Traffic Mitigation Measure 7.6 for the intersection of Buena Vista Street and Empire Avenue ("Intersection # 19") states that the City "shall provide" provide three left turn lanes on the westbound approach, three southbound departure lanes, two left turn lanes on all other approaches, and an exclusive right turn lane on all approaches.  There are no specified provisions in Traffic Mitigation Measure 7.2 or in Traffic Mitigation Measure 7.6 themselves dealing with the "timing" for implementation of the measures.

The Mitigation Monitoring Plan and Program described in the EIR (*post*) included statements concerning the "timing" for each of the traffic mitigation measure identified for the Empire Center development project as set forth in the EIR.  According to the Mitigation Monitoring Plan and Program, the stated timing for traffic mitigation measure 7.1 would be:  "Concurrent with issuance of first building permit."  According to the Mitigation Monitoring Plan and Program, the stated timing for traffic mitigation measure 7.2 would be:  "Prior to issuance of building permits for each building in each phase *according to Mitigation Measure 7.1*."  (Italics added.)  According to the Mitigation Monitoring Plan and Program, the stated timing for traffic mitigation measure 7.6 would be the same.

---

[4]     Traffic Mitigation Measure 7.1 also referred to a developer's transportation fee. The developer ultimately paid a $10 million transportation fee to the City. There are no issues concerning the transportation fee in the current case.

4

At about the same time it adopted the Planned Development No. 97-3 ordinance (September 2000) , the City also approved a "Development Agreement" between the City and Zelman Retail Partners, Inc. (not a party in the current litigation over the proposed Wal-Mart store).[5] The Development Agreement includes provisions concerning "Traffic Mitigation." Those provisions include the following paragraph:

> "City Obligations. The City agrees to construct or cause the construction of certain street improvements at the intersection of Burbank Boulevard, Victory Boulevard, and Victory Place (the 'Five Points Project'), and shall use its best efforts to start the Five Points Project by January 1, 2001, and to complete the Five Points Project before October 1, 2001. *Whether or not the Five Points Project is completed, no governmental permit*, including but not limited to a temporary certificate of occupancy, final certificate of occupancy or certificate of completion *shall be withheld* by the City for any building in the [Empire Center development project] *because of the City's failure to complete the Five Points Project*. The City shall bear all responsibility for any traffic mitigation measure required under CEQA or by the [Environmental Impact Report] prior to or during the construction of the Five Points Project. The City agrees to implement at its sole cost and expense interim traffic mitigation measures until the completion of the Five Points Project. A specific list of all the traffic improvements required to mitigate the impacts of the [Empire Center development project] and the party responsible for such mitigation is set forth in the [Environmental Impact Report] and the Conditions of Approval." (Italics added.)

---

[5] Development agreements are authorized and controlled by statute. (See generally, Govt. Code, § 65864 et seq.) Among the purposes of such agreements are to provide assurance to an applicant for a development project that that the project will not be blocked by changes in policies, rules and regulations after approval. (See Govt. Code, § 65846, subd. (b); and see *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1013.)

In the course of much later events dealing with the proposed Wal-Mart store, a planner in the City's Community Development Department prepared an internal City memorandum in which he acknowledged that, as of January 2012, a number of the listed Traffic Mitigation Measures in the Planned Development No. 97-3 ordinance were only "partially completed." At a public city council meeting in January 2012, the planner acknowledged that certain Traffic Mitigation Measures were "never fully completed" because the City had been "constrained by right of way issues." The planner further explained: "And the City's current policy is to acquire private property for the completion [of] mitigation measures as the opportunities arise." In an email exchange during September 2011, another City planner labeled some of the Traffic Mitigation Measures as "infeasible due to right of way," and others as "infeasible due to being outside our jurisdiction."[6]

In sum, a decade after the Empire Center development project opened, the City has not yet completed all of the Traffic Mitigation Measures described in the EIR for the project, and prescribed in the Planned Development No. 97-3 ordinance. The overriding dispute in the current litigation is whether the City has failed an obligation to do so, and whether it must do so now before it issues building permit to Wal-Mart.

***The Proposed Wal-Mart Store Project***

During the general public comment portions of a series of city council meetings held in the first half of 2012, the council listened to public comment on the proposed Wal-Mart store project. In connection with these meetings, the city council reviewed, noted and filed staff reports, and took votes on a number of matters, including whether environmental review was required under CEQA or, alternatively, whether the proposed Wal-Mart store project was exempt from CEQA review. Wal-Mart did not send representatives to attend the city council meetings. The City's planning staff

---

[6] Some of the Traffic Mitigation Measures (7.7 to 7.9) in Planned Development No. 97-3 dealt with access from the Interstate 5 Freeway. The EIR for the Empire Center development project generally explained that such measures "may be completed after occupancy of the project" because the City had to rely on Cal-Trans for the freeway improvements.

recommended to the city council that it find the issuance of building permits to Wal-Mart was a "ministerial" matter dealing with "tenant improvements" for the proposed store in an existing building formerly occupied by another store.

Opponents of the proposed Wal-Mart store project submitted "comment letters" from a traffic engineer, Tom Brohard, and a urban planner, Robert Rodino. Both experts opined that the proposed Wal-Mart store with a grocery is not the same project that was studied at the time of the 2000 EIR for the Empire Center development project. As the experts noted, the original environmental studies analyzed the impacts of a Great Indoors furniture store, not a 142,000 square foot Wal-Mart store including a grocery. Traffic engineer Brohard explained his conclusions that the Wal-Mart store will generate vastly more traffic than the Great Indoors store. He specifically noted that the intersections of Buena Vista Street and Victory Boulevard and Buena Vista Street and Empire Avenue intersections were already significantly impacted under the City's traffic standards after the Empire Center opened. He offered that new, unstudied, significant traffic impacts on these intersections would be created by the proposed Wal-Mart store.

At its meeting on May 30, 2012, the city council voted to adopt a "Notice of Exemption" for the proposed Wal-Mart store project under CEQA section § 21080, subdivision (b)(1), and the CEQA Guidelines (see Cal. Code Regs., tit. 14, § 15000 et seq.) section 15268. The city council's vote cleared the way for the City's Community Development Department to issue two building permits to Wal-Mart on June 1, 2012.

*The Litigation*

Meanwhile, on May 4, 2012, shortly before the City voted to issue the building permits to Wal-Mart, Burbank residents Shanna Ingalsbee, Katherine Olson and Yvette Ziraldo (collectively petitioners) filed a petition for writ of mandate and complaint for injunctive relief against the City, naming Wal-Mart as a real party in interest. On June 6, 2012, petitioners filed their operative first amended petition alleging violations of CEQA, the "Conditions of Approval," specifically, the Traffic Mitigation Measures, prescribed in the Planned Development No. 97-3 ordinance, and the Burbank Municipal Code. The petition alleges that the City has failed to implement the Traffic Mitigation Measures

7

prescribed in the Planned Development No. 97-3 ordinance within the timing requirements stated in the Mitigation Monitoring Plan and Program described in the 2000 EIR for the Empire Center development project. Further, the petition alleges the City violated the prohibition on a grocery store in Sub Area D as prescribed in the Planned Development No. 97-3 ordinance; and that the City also violated parking requirements in the Burbank Municipal Code. The petition alleges the City violated CEQA by determining the building permits would issue for the Wal-Mart store project as a "ministerial" matter, exempt from additional CEQA review, and by failing to conduct environmental review under CEQA. In essence, petitioners claim the City issued the building permits for the Wal-Mart store project in violation of law, and that the City should be ordered to set aside the building permits until the City complies with the law.

In early July 2012, lawyers representing Wal-Mart gave notice to petitioners' lawyers by letter that the company planned to start construction-related activities at the Empire Center site on or about July 18, 2012. In mid-July 2012, petitioners filed a motion for preliminary injunction and supporting evidence to stop any construction activity at the proposed Wal-Mart store site pending trial. On August 23, 2012, the trial court issued an order for a preliminary injunction, and, on August 28, 2012, the court issued a revised order for a preliminary injunction.[7]

On October 22, 2012, the City and Wal-Mart each filed a notice of appeal from the trial court's order of August 23, 2012, and revised order dated August 28, 2012, granting the preliminary injunction.

---

[7] In September 2012, the filing of a lot more paper ensued with a motion by the City and Wal-Mart to dissolve the preliminary injunction. In November 2012, the trial court denied the motion to dissolve the preliminary injunction. The order denying the motion to dissolve the preliminary injunction is not challenged by the City and Wal-Mart on appeal.

8

## I.     Probability of Prevailing

In a joint opening brief on appeal, the City and Wal-Mart first contend that the trial court's order granting the preliminary injunction must be reversed because the court erred in determining there was a reasonable probability that petitioners would prevail on their claims at trial.  We disagree.

### *The Governing Law*

In the broadest terms, a trial court has discretion to grant a preliminary injunction when it determines, upon balancing the respective equities of the parties, that a defendant should be restrained from a challenged activity pending trial.  (See *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69 (*IT Corp.*); and see also *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528 (*Continental Baking*).)  In making this determination, the court "will consider the probability of the plaintiff's ultimately prevailing in the case and, it has been said, will deny a preliminary injunction unless there is a reasonable probability that plaintiff will be successful in the assertion of his rights."  (*Continental Baking, supra,* 68 Cal.2d at p. 528.)  Courts have also phrased this factor as "the likelihood that the plaintiff will prevail on the merits at trial."  (*IT Corp, supra*, 35 Cal.3d at p. 69.)  The cases speak of the required probability showing in terms of a showing of a reasonable probability of prevailing on the merits, not a showing of a probability of prevailing on the merits by a preponderance of the evidence.  On the other hand, a preliminary injunction may not be granted when there is "no possibility" the plaintiff will succeed on the merits.  (*Scates v. Rydingsword* (1991) 229 Cal.App.3d 1085, 1096.)

When the determination of a plaintiff's probability of prevailing on the merits at trial depends on a pure question of law such as the interpretation of a statute, an appellate court may independently review whether the trial court's interpretation was correct as a matter of law and, therefore, whether there is a probability of prevailing on the merits. (*Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094-1095.) "'If such a question of pure law is presented, it can sometimes be determinative over other factor[s], for example, when the defendant shows that the plaintiff's interpretation

9

is wrong as a matter of law and thus the plaintiff has no possibility of success on the merits.'" (*Id*. at p. 1095, quoting *Hunter v. City of Whittier* (1989) 209 Cal.App.3d 588, 595-596.)

So, if a plaintiff has a cognizable claim under the law, and substantial evidence which would sustain a judgment in favor of the plaintiff is presented, then there is a reasonable probability the plaintiff will prevail on the merits at trial, and a trial court may grant a preliminary injunction after balancing all of the relevant circumstances. On appeal, a reviewing court may not disturb an injunction unless the appellant demonstrates an abuse of discretion. (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.)

***The Trial Court's Decision to Grant the Preliminary Injunction***

Petitioners' operative pleading claims that, in issuing building permits for the Wal-Mart store project in the Empire Center, the City violated CEQA, the Burbank Municipal Code, and the Planned Development No. 97-3 ordinance. Petitioners seek the following relief: (1) a peremptory writ of mandate ordering the City to "set aside and void any" CEQA exemption determination, and the building permits for the Wal-Mart store project, pending the City's compliance with CEQA; (2) a peremptory writ of mandate ordering the City to set aside and void the building permits issued for the Wal-Mart store project pending the City's compliance with the Planned Development No. 97-03 ordinance and the Burbank Municipal Code and (3) an injunction prohibiting the City and Wal-Mart from proceeding with any actions in furtherance of the Wal-Mart store project, and to cease all work at the site, until the City complies with the law.

In granting the preliminary injunction, the trial court focused its primary attention on the "timing mandates" for the Traffic Mitigation Measures prescribed in the Planned Development No. 97-3 ordinance. In its initial order granting the preliminary injunction on August 23, 2012, the court expressed its understanding that it is the City's position that Traffic Mitigation Measure 7.1 in the Planned Development No. 97-3 ordinance controls over any timing mandate for Traffic Mitigation Measures 7.2 and 7.6 as stated in the Mitigation Monitoring Plan and Program. Further, the court noted the City interprets Traffic Mitigation Measure 7.1 to mean that the City "need not" have fully implemented

10

Traffic Mitigation Measures 7.2 and 7.6 before the issuance of the building permits to Wal-Mart, and that this is so "because [the City has concluded that] Level of Service (LOS) levels [at the subject intersections] are satisfactory" within the meaning of Traffic Mitigation Measure 7.1.[8] The trial court then gave the following stated reasons for why the City's proffered interpretation did not necessarily put an end to petitioners' action:

"[Traffic] Mitigation Measure 7.1 provides, in part, that 'concurrent with issuance of the first building permit . . .' the City 'shall have prepared and shall have begun implementing' roadway improvements to implement [Traffic Mitigation] Measures 7.1 through 7.14, including 7.2 and 7.6.

"[The City's Deputy City Planner of Transportation, David] Kriske notes that some of the projects required under [Traffic Mitigation Measures] 7.2 and 7.6 are not completed . . . and are only 'planned,' and, he states, *inter alia,* that he does 'not believe it will be necessary to implement [Traffic] Mitigation Measures 7.2 and 7.6.' . . .

"Further, it is uncertain what affect the City's LOS concept has on the requirement [in Traffic Mitigation Measure 7.1] that 'significant impacts' are avoided or mitigated below a 'level of significance.' [The] City fails to provide convincing facts thus far showing that any precise LOS (i.e. LOS-D) fits these criteria. The alternative criteria in [Traffic Mitigation Measure] 7.1 is that the measures be 'substantially complete as defined in the Development Agreement.' At trial, the burden [will be] on the City to show that the issuance of the subject permits fall within the parameter of the criteria set forth in [Traffic] Mitigation Measure 7.1. The City's position in this motion is that they have absolutely shown that in [its] papers. They have not. The issues remain for trial of the mandate action.

_____

[8]     We understand Level of Service or LOS to be a term of art used by traffic engineers in measuring traffic flow. We understand LOS is described using the letters A through F, with A describing free traffic flow, and F essentially describing what could be called bumper-to-bumper, stop-and-go traffic. (Level of Service, Wikipedia (as of March 26, 2012.)

11

"The City self-proclaims that there is now 'substantial compliance' [with the Traffic Mitigation Measures] or that impacts are mitigated below a level of significance. Of course, that determination will be ultimately made at the mandate trial. But, due to reasonable doubt as to the internal proclamation that LOS-D meets the criteria of [Traffic Mitigation Measure] section 7.1; and, due to insufficient supporting facts at this stage, the Court concludes that petitioners are likely to prevail if the record and evidence remains as it is."

*Analysis*

Because the trial court focused solely on the Traffic Mitigation Measures in the Planned Development No, 97-3 ordinance, and because we may not ourselves decide as a de novo matter whether a preliminary injunction should issue, we limit our review on this appeal to petitioners' claim that the City violated the Traffic Mitigation Measures, and do not address whether petitioners may prevail at trial on their claims that the City violated CEQA and the Burbank Municipal Code. Accordingly, we turn to the question of whether the record on appeal supports the trial court's determination there is a reasonable probability petitioners will prevail at trial on their claim that the City violated the Traffic Mitigation Measures imposed on the Empire Center development project by the Planned Development No. 97-3 ordinance.

Fairly construed, the City and Wal-Mart's argument is that there is no reasonable probability petitioners will prevail at trial because (1) the success of their case depends on questions of law, namely, the statutory interpretation of the Traffic Mitigation Measures, and (2) the City's interpretation of the Traffic Mitigation Measures is correct as a matter of law, and defeats any possibility that petitioners will prevail on their claim that the City violated the Traffic Mitigation Measures. The City argues that the required timing for implementation of the Traffic Mitigation Measures in the Planned Development No. 97-3 ordinance is governed by Traffic Mitigation Measure 7.1, and that Traffic Mitigation Measure 7.1 expressly connects the timing for implementation of the Traffic Mitigation Measures to the existence of actual traffic impacts. The City argues that petitioners are

wrong that the timing for implementation of any Traffic Mitigation Measures 7.2 and 7.6, is tied to the issuance of building permits (i.e., "prior to issuance of building permits").[9]

The City argues the trial court erred in rejecting the City's interpretation of Traffic Mitigation Measure 7.1. According to the City, interpreting Traffic Mitigation Measure 7.1 any other way than offered by the City is wrong as a matter of law because it essentially deletes the following (italicized) language from the measure: " . . . [Roadway and intersection] improvements shall be fully implemented pursuant to the roadway and intersection improvement plan [prepared by the City] *such that significant impacts* are thereby *avoided or mitigated below a level of significance at the time of completion of the project* . . . ." The City argues that Traffic Mitigation Measure 7.1, correctly interpreted, means that implementation of Traffic Mitigation Measures 7.2 and 7.6 is only required, in the words of the opening brief on appeal, "as necessary to mitigate or avoid operations of the intersections at a level below LOS D," which is apparently the City's definition of a "level of significance." Standing on the foundation of this interpretation, the City argues that the "uncontradicted evidence in the record demonstrates there was no need to complete [Traffic Mitigation Measures] 7.2 or 7.6 at the time of the issuance of the building permits to Wal-Mart because both intersections are [currently] operating at or above acceptable levels." The City's arguments do not persuade us to reverse the preliminary injunction based on the "probability of prevailing element."

First, we disagree with the City's contention, implied or express, that the trial court necessarily ruled petitioners are legally correct in asserting that the required timing for implementation of Traffic Mitigation Measures 7.2 and 7.6 is "prior to issuance of building permits in each phase." In our reading of the record, the court appears to have said that the City is not necessarily correct as a matter of law that it need not have

<hr/>

[9]     We understand petitioners' action to allege that the building permits to Wal-Mart cannot be issued because the City has not finished implementing certain traffic mitigation measures. We understand from the record that there may be an issue whether a claim that building permits may not be issued is barred by limitations or laches inasmuch as perhaps as many as 1,300 building permits have been issued for projects in and around the Empire Center area since it opened in the early 2000s.

completed implementation of the Traffic Mitigation Measures at the present time because, in the City's conclusion, there are no "significant traffic impacts" and traffic impacts otherwise have been "avoided or mitigated below a level of significance." In other words, the court found a reasonable probability that petitioners will prevail on the merits at trial because the City did not establish its defense as a matter of law at the preliminary hearing stage.

Second, we understand the trial court to have been saying that the language in Traffic Mitigation Measure 7.1, specifically the terms "significant traffic impacts" and "avoided or mitigated below a level of significance" are not expressly defined in Traffic Mitigation Measure 7.1. Instead, the court indicated evidence may be required to aid in an interpretation. Further, that even with a definition of these terms, triable issues may still remain whether, in fact, the subject intersections are suffering "significant traffic impacts," or whether, in fact, traffic impacts have been "avoided or mitigated below a level of significance" In this vein, we understand the court to have determined that petitioners may be able to prevail on their claim that the City violated of the timing requirements for implementation of Traffic Mitigation Measures 7.2 and 7.6, even if the City's interpretation of Traffic Mitigation Measure 7.1 is correct. The evidence may show there are "significant traffic impacts" which will worsen with the Wal-Mart store, and that such traffic impacts have not been "avoided or mitigated below a level of significance."

We agree with the trial court that there is a reasonable probability petitioners will prevail at trial. Although the record and arguments on appeal are somewhat of a mish-mash, we are satisfied there is enough to affirm the trial court's probability of prevailing determination. Having imposed traffic mitigating conditions on the Empire Center development project by ordinance, the City "cannot simply ignore them. Mitigating conditions are not mere expressions of hope." (See *Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1508 [claims involving mitigating conditions in a land use plan].) Whether the City may delete or modify any existing mitigating conditions imposed on the Empire Center development project upon following

14

a proper procedural avenue is not an issue in the current litigation. (*Id*. at pp. 1508-1509.)

This brings us to another of the City's arguments they believe show petitioners cannot prevail at trial. That is, even if petitioners are correct that the City was required to complete implementation of Traffic Mitigation Measures 7.2 and 7.6 at some point in time in the past, it does not follow that the City is currently subject to a mandatory legal duty *to refrain from issuing building permits* until it has completed implementation. In other words, the City argues petitioners cannot win because they cannot obtain the mandamus and injunctive remedies that they seek for the alleged violation of Traffic Mitigation Measures 7.1, 7.2 and 7.6.

The City argues the Development Agreement for the Empire Center development project expressly provides that the City's failure to complete implementation of Traffic Measures 7.1, 7.2 and 7.6 is not grounds for withholding any permits. The City's argument cites and relies upon the Development Agreement's provisions regarding "Traffic Mitigation" which we quoted above. (Page 4, *ante*.) We are not persuaded to reverse the trial court's preliminary injunction based on the Development Agreement.

The problem with the City's reliance on the Traffic Mitigation provisions in the Development Agreement is that those provisions do not state, as the City asserts, that "no government permit shall be withheld by the City for any building" in the Empire Center development project in the event the City fails to implement *any* of the Traffic Mitigation Measures associated with the project. On the contrary, the terms of the Development Agreement are quite unambiguous, and less limited than the City asserts. The Agreement states that "no government permit shall be withheld by the City for any building" in the Empire Center development project based upon the City's failure to complete the "Five Points Project" by a specified date. The Five Points Project is not an issue in the present case. The City's remaining citations for the proposition that the issuance of building permits was a "vested," enforceable contract right of the developer of the Empire Center (and presumably all future occupants of the property) under the Development Agreement are too broad to be helpful. For example, the City provides a

15

blanket cite to the entirety of the 50-page resolution adopting the EIR for the Empire Center development project, which refers to the Development Agreement. The City's blanket cite to the entirety of the Development Agreement is unhelpful. If there is a specific provision in the Development Agreement which states that the City's obligation to issue building permits is mandated under the Development Agreement wholly apart from the City's implementation of the Traffic Mitigation Measures, the City has not pointed us to such a provision.

In any event, the Development Agreement sets forth the respective contract rights and obligations between the City and the developer of the Empire Center development project. The City's argument has not persuaded us that, in the event a party with standing establishes a violation of CEQA or of the Planned Development No. 97-3 ordinance, a court may not order mandamus and injunctive relief to compel compliance with the law.[10]

We acknowledge the City's argument that the evidence shows it in compliance with the timing requirements for Traffic Mitigation Measures 7.1, 7.2, and 7.6, meaning the building permits were properly issued to Wal-Mart. The City may well be correct, but we reject the City's necessarily inherent position that the evidence shows as a matter of law that the City is in compliance. In the end, we agree with the court below that trial will determine whether the City is in compliance.

---

[10]    In their respondents' brief on appeal, petitioners have dedicated considerable ink and paper to an argument that the City has, in its opening brief on appeal, supported its arguments with materials that were either prepared or compiled *after* the date the City issued the building permits to Wal-Mart. Petitioners contend that such materials should not be admissible at trial of the propriety of the issuance of the permits, and, thus, should not be considered in reviewing the granting of the preliminary injunction. In its reply brief on appeal , the City has responded in kind to petitioners' evidence-based argument. Having found that the trial court correctly determined there is a reasonable probability petitioners will prevail at trial, we decline to address petitioners' evidentiary argument. The trial court will rule on evidence issues at trial, and we decline to offer any opinion that may be construed as binding the trial court's hands in making such evidence rulings. The trial court will be in a better position to make appropriate evidence rulings in the first instance at trial, than is our court in reviewing a preliminary injunction.

## II.     Harm to Petitioners—Harm to the City and Wal-Mart

The City and Wal-Mart contend the trial court's order granting the preliminary injunction must be reversed because the trial court erred in finding *the public will suffer harm* without a preliminary injunction, and in finding the City and Wal-Mart *will not suffer harm* by a preliminary injunction.  We agree.

### *The Governing Law*

A trial court must evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction.  The first, as we discussed above, is the likelihood that the plaintiff will prevail on the merits at trial.  "The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp., supra*, 35 Cal.3d at pp. 69-70.)  The published cases uniformly hold that the granting or denial of a preliminary injunction rests in the sound discretion of the trial court, even though the evidence with respect to the right to an injunction is conflicting, and that the trial court's order may not be disturbed on appeal unless the enjoined party demonstrates an abuse of discretion. (*Id*. at p. 69.)  But, "[i]f the trial court abused its discretion on either factor, we must reverse." (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625.)

### *What Is At Stake*

Petitioners have brought their action to set aside building permits issued to Wal-Mart until the City complies with CEQA, the Planned Development No. 97-3 ordinance, and the Burbank Municipal Code.  The construction improvements to be undertaken by Wal-Mart under authority of the building permits, before it "re-tenants" (Wal-Mart's term) the existing building formerly occupied by the Great Indoors home furnishing store, consist of such elements as new building signage and site signage; new exterior paint; replacement of doors in the vestibule area; a new "roll-up" delivery door at the rear of store; new egress doors and concrete stoops as required by building code requirements; new ramps at the rear of the building for direct store delivery door; new windows; the removal of "swing" entry doors and replacement with new auto slider doors; adding an

external electrical switchgear box (9′-7″ W x 5′ H x 3′ D in size) along the rear of the building wall adjacent to the existing transformer; removal of a portion of the concrete sidewalk located in front of the main entry to provide a curb ramp that complies with local building codes in compliance with the Americans With Disabilities Act; the removal of a previously installed merchandise pick-up auto slider door and the resultant opening in-filled with material to match existing construction; the addition of two 1000-gallon grease interceptors; and installing a new compactor in the location of the existing compactor.

There is no dispute that petitioners' action seeks injunctive and mandamus relief based on their allegations that the Wal-Mart store, *when opened*, will bring significantly more traffic to the Empire Center area. But, there is no evidence in the record that issuance of the building permits and the onset of the construction activities noted above will bring the adverse traffic impacts at which petitioners' action is targeted. In short, there is no evidence petitioners will suffer the type of harm they seek to avoid by their action. If and when the time comes for the Wal-Mart store to open, then a different situation may arise. That is not what is at stake in petitioners' action as currently presented. This is not a case in which a natural habitat or other environmental setting would be irreparable lost or damaged by the start of construction. We have no doubt that the start of construction may be enjoined in such a situation, pending a final determination of an action on the merits. But, here, the claimed environmental harm is increased traffic, and that harm will not result by lifting the preliminary injunction prohibiting construction.

We disagree with petitioners that their case will become moot if construction is allowed to begin. There is no evidence that the Wal-Mart improvements are irreversible. If petitioners prevail, then relief could still be granted to enjoin Wal-Mart from keepings its improvements in place. (See, e.g., *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1203-1204.) If Wal-Mart wants to start fixing up its Empire Center store at the financial risk of having to dismantle its improvements in

the event petitioners prevail at trial, so be it. But petitioners are not being harmed in the interim.

On the other side of the scale, the trial court's finding that the City and Wal-Mart will not suffer harm seems to be based on a perception that delay and economic costs are not harms. These are harms, albeit harms that likely could be absorbed by the City and Wal-Mart without long-term adverse consequence. But they are still harms. The record discloses evidence showing that construction of the Wal-Mart store improvements would provide skilled construction jobs to the area. The loss of economic activity is an actual harm. And the delay in the construction process will consequently cause delay in hiring and employing store workers, and in the availability of retail services to the local community, and the collection of sales tax revenue. Although employment, retail services and tax revenues are not currently being realized, meaning the injunction is not directly causing a *loss* of such factors at present, delay in realizing such benefits is nonetheless an actual harm in an economic sense.

It cannot be questioned that the trial court had and has discretion in determining whether to grant the preliminary injunction, and in balancing the respective harms to the public, and to the City and Wal-Mart. What the court could not do was to find there was harm here, when there was not; and to find there was no harm here, when there was. For the reasons explained, we find the trial court abused its discretion in evaluating "the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp., supra,* 35 Cal.3d at pp. 69-70.) Accordingly, the preliminary injunction must be reversed. (*Shoemaker v. County of Los Angeles, supra,* 37 Cal.App.4th at p. 625.)

**DISPOSITION**

The order granting a preliminary injunction is reversed.  The cause is remanded to the trial court for further proceedings consistent with this opinion.  Each party to bear its own costs on appeal.


BIGELOW, P. J.

We concur:


FLIER, J.


CROSKEY, J.[*]


---

[*]    Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.