Filed 12/5/17

## <u>CERTIFIED FOR PUBLICATION</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| ITV GURNEY HOLDING INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> SCOTT GURNEY et al., <br><br> Defendants and Respondents. | B281694 <br> (consolidated w/B283476) <br><br> (Los Angeles County <br> Super. Ct. No. BC 643237) |

APPEAL from an order of the Superior Court of Los Angeles County, Susan Bryant-Deason, Judge.  Affirmed in part and reversed in part.

_____

Munger, Tolles & Olson, Fred A. Rowley, Jr., Mark R. Yohalem, John L. Schwab, Nicholas S. Dufau; Hogan Lovells US, Paul B. Salvaty, Megan Dixon, Poopak Nourafchan and Laura M. Groen for Plaintiffs and Appellants.

Kendall Brill & Kelly, Philip M. Kelly, Nicholas F. Daum; White & Case, Bryan A. Merryman; Lavely & Singer, and Michael E. Weinstein for Defendants and Respondents.

_____

Plaintiffs and appellants ITV Gurney Holding Inc. (ITV) and Gurney Productions, LLC (the Company) challenge the trial court's grant of a preliminary injunction in favor of defendants and respondents Scott Gurney and Deirdre Gurney (the Gurneys), and Little Win, LLC. The Gurneys are the minority owners of the Company and formerly served as its chief executive officers (CEO's), pursuant to an employment agreement. The Company fired the Gurneys as CEO's and removed them from managing the day-to-day operations of the Company. The Gurneys do not challenge the Company's right to fire them as CEO's. Rather, they contend that under the operating agreement that governs the Company, they could not be removed from managing its day-to-day operations. Plaintiffs contend the operating agreement gave the Company, through its board of managers, the ultimate authority to manage the Company, and thus permitted the board to remove the Gurneys as managers of the day-to-day operations. We agree with plaintiffs and reverse the trial court's order to the extent that it reinstated the Gurneys to their positions managing the day-to-day operations of the Company. The Gurneys continue as members of the Company's board of managers, and we affirm the portion of the preliminary injunction barring the Company from impinging on their rights as board members.

## FACTS AND PROCEEDINGS BELOW

The Gurneys have been producing reality-television programming since 2005. Their greatest success was the program *Duck Dynasty*.

In 2012, the Gurneys agreed to sell 61.5 percent of their production business to ITV, an affiliate of the British media company ITV plc. As part of the transaction, the parties signed two contracts relevant to this appeal: an operating agreement, which defined the structure of the Company and the terms under which the owners could buy and sell their stakes, and

2

employment agreements, which established the terms of the Gurneys' employment as joint CEO's.

The operating agreement provided for a board of managers composed of five members, three of whom were to be appointed by ITV, and two by the Gurneys' shell company, Little Win, LLC. The Gurneys themselves were designated as Little Win, LLC's representatives on the board. In most instances, the operating agreement allowed the board to decide matters by majority vote, but several situations required unanimity. In particular, unanimous approval was required for "[o]perating the Company and its [s]ubsidiaries other than as a television production company in the ordinary course of business consistent with past practice of the Gurneys, the Company's five year forecasts and the [b]udget; except that, without the approval of all [m]anagers, the Gurneys may [among other powers]: [¶] . . . manage the day-to-day business and affairs of the Company."

The operating agreement also provided for specific time frames within which ITV was entitled to buy out the Gurneys' ownership interest, and the Gurneys were entitled to sell their interest to ITV. ITV's right to "call," or purchase, the Gurneys' interest, was to run for 90 days after the Company's auditor delivered the audited financial statements for the year 2015. In addition, if "the Company terminates the employment of either Gurney with [g]ood [c]ause (as such term is defined in such Gurney's [e]mployment [a]greement with the Company) . . . before the end of fiscal year 2015," ITV would be entitled to purchase the Gurneys' interest on similar terms. If ITV did not exercise its call rights, the Gurneys were entitled to "put," or sell, their stake to ITV at any time after the auditor delivered the financial statements for 2017. The operating agreement established the price for the Gurneys' ownership interest in a put or call as a multiple of the Company's average EBITDA (earnings before interest, taxes, depreciation, and amortization) for the preceding three years.

3

The Gurneys also signed employment agreements to serve as co-CEO's of the Company. These agreements required the Gurneys to devote their "full business time and efforts to the performance of [their] duties for [the] Company" for the five-year period ending December 31, 2017, with annual renewals thereafter at the option of both the Gurneys and ITV. For their work, the Gurneys were each to receive $500,000 per year. A majority of the Company's board could vote to remove the Gurneys for good cause if, among other reasons, the Gurneys "willfully engage[d] in any activity that is in direct conflict with [their] duties and responsibilities" under the agreements, or "breach[ed their] fiduciary duty to the Company or any affiliated entity, including acts of self-dealing (whether or not for personal profit)." The Company was also entitled to terminate the Gurneys' employment without cause at any time after the contract had been in force for three years, that is, after 2015.

In the employment agreements, the Gurneys agreed not to "engage directly or indirectly in any activity that competes with the business activities of the Company. The business activities of the Company are defined as the development, production, promotion, and marketing of reality-based programs whether for television, internet or other broadcast, cable, electronic or digital media." The Gurneys also agreed that, while they were employed and for one year afterward, they would "not interfere with, impair, disrupt or damage [the] Company's business by soliciting, encouraging or recruiting any of [the] Company's employees or causing others to solicit or encourage any of [the] Company's employees to discontinue their employment with [the] Company."

In the summer of 2016, the Gurneys learned that ITV's parent company was pressuring its United States-based subsidiaries and affiliates, including the Company, to reduce expenses. Around July 2016, the Gurneys formed a new television production company called Snake River Productions. According to the Gurneys, their intention was to produce

4

programming other than reality shows, and to have an alternative source of employment in case ITV elected not to renew their contracts at the Company. At around the same time, the Gurneys were attempting, without success, to sell a second season of a reality program called *Sons of Winter* to a network for broadcast. The Discovery Channel had aired the first season of the program but elected not to renew it. At a September 2016 board meeting, the Gurneys informed the other board members that they had sold the rights to *Sons of Winter* for $3.6 million. When asked who the buyer was, Deirdre Gurney claimed she could not remember the company's name, but when Scott reminded her, she acknowledged that it was Snake River Productions. Neither of the Gurneys told the board that they owned Snake River Productions.

Plaintiffs allege that the purpose of Snake River Productions' purchase of *Sons of Winter* was financial manipulation. They claim that the sale of *Sons of Winter* was an attempt by the Gurneys to increase the Company's EBITDA, and thus to increase the price at which the Gurneys would be entitled to sell their stake in the Company to ITV under the terms of the operating agreement. A witness for the plaintiffs calculated that the sale of *Sons of Winter*, if considered in calculating EBITDA, would increase the potential sale price of the Gurneys' ownership interest by approximately $3.71 million. In addition, because the Gurneys and their holding company owned 38.5 percent of the Company, they would be entitled to a distribution of approximately $1.39 million of the price Snake River Productions had paid for the rights to *Sons of Winter*. Thus, by buying *Sons of Winter* for $3.6 million, the Gurneys could potentially obtain as much as $5.1 million for themselves, even if *Sons of Winter* had no value.

Around the same time, the Gurneys decided to fire two of the employees on the Company's development team with the expectation of rehiring them to work at Snake River Productions.

Approximately one week after the September board meeting, the Company's chief financial officer (CFO), who under the terms of the operating agreement was appointed by ITV, informed ITV that the Gurneys owned Snake River Productions. The CFO also told ITV about other financial irregularities he perceived in the Gurneys' management of the Company, including the payment of a $350,000 advance to the Gurneys that the CFO believed was improper.

At a board meeting in December 2016, the ITV-appointed board members—who constituted a majority of the board—voted to place the Gurneys on a paid leave of absence while the charges against them were being investigated. A few days later, the same board members voted to terminate the Gurneys' employment for cause, alleging that the Gurneys had violated their duty of loyalty to the Company by concealing the facts surrounding the sale of *Sons of Winter*, along with engaging in other misconduct. The next day, ITV and the Company filed suit against defendants and thereafter defendants filed a cross-complaint against the Company. ITV also attempted to exercise its call rights and purchase the Gurneys' share of the Company, and the Gurneys attempted to exercise their put rights and sell their share of the Company to ITV. The parties, however, did not consummate a sale because they could not agree on a price.

On February 1, 2017, the Gurneys filed a motion for a preliminary injunction, requesting that the court restrain plaintiffs from breaching the operating agreement. In particular, the Gurneys asked the court to bar ITV from exercising its call rights, and to order the Company to restore the Gurneys to the day-to-day management of the Company.

After a hearing, the trial court issued a preliminary injunction granting both requests. The trial court found that ITV was unlikely to succeed in its claim regarding its call rights because, by the time ITV elected to exercise those rights, those rights had expired. Under the terms of the operating agreement,

6

the period in which ITV was entitled to buy out the Gurneys' shares ran 90 days from the end of the 2015 fiscal year, but ITV did not notify the Gurneys of its intent to purchase the shares until February 2017. The injunction also required that the Company restore the Gurneys to their positions as day-to-day managers of the Company.

## DISCUSSION

Plaintiffs contend that the trial court abused its discretion by granting the preliminary injunction. They argue that because the employment agreement allowed the board to terminate the Gurneys' employment with or without cause at any time, it is irrelevant for purposes of a preliminary injunction whether or not good cause supported the Gurneys' termination. Plaintiffs also argue that the operating agreement does not provide the Gurneys an independent basis for exercising day-to-day authority over the Company.

We agree with plaintiffs' position regarding the interpretation of the operating agreement and employment agreements. On this basis, we conclude that the trial court abused its discretion by granting a preliminary injunction reinstating the Gurneys to management positions. Because the interpretation of the contracts is decisive in this case, we need not and do not reach a determination of the other issues the parties have raised in their briefs, including the questions of whether the Gurneys violated their fiduciary duties or otherwise breached their contracts with the Company, and whether the trial court erred by sustaining a number of the Gurneys' objections to plaintiffs' evidence.[1]

Although we reverse the trial court's order restoring the Gurneys to day-to-day management of the Company, we leave in

---

[1] Defendants filed a motion to strike portions of plaintiffs' reply brief, and plaintiffs filed a motion to strike portions of the defendants' motion. We deny both motions.

place the other portions of the preliminary injunction. This includes the portion of the injunction denying ITV's request to exercise its call rights to purchase the remainder of the Company, a ruling which plaintiffs have not challenged on appeal. It also includes the portion of the injunction barring the Company from violating the Gurneys' rights as members of the board of managers, including their right to vote on matters requiring unanimous board approval. Those rights belong to the Gurneys so long as they and their shell company own at least 10 percent of the Company, regardless of whether they continue to be employed as CEO's.

## A. Standards of Review of a Preliminary Injunction

Pursuant to longstanding Supreme Court case law, "trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70.) We review a trial court's application of these factors for abuse of discretion. (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1047.)

"Notwithstanding the applicability of the abuse of discretion standard of review, the specific determinations underlying the superior court's decision are subject to appellate scrutiny under the standard of review appropriate to that type of determination. [Citation.] For instance, the superior court's express and implied findings of fact are accepted by appellate courts if supported by substantial evidence, and the superior court's conclusions on issues of pure law are subject to independent review." (*Smith v. Adventist Health System / West* (2010) 182 Cal.App.4th 729, 739.) Because this case involves only

8

the interpretation of contracts, which is a question of pure law, our review is de novo.  (See *Taylor v. Nu Digital Marketing, Inc.* (2016) 245 Cal.App.4th 283, 288.)

Injunctions may be either mandatory, in that they compel a party to take an action, or prohibitory, in that they attempt to maintain the status quo by restraining a party from taking action.  (*Oiye v. Fox, supra*, 211 Cal.App.4th at p. 1048.) " ' " 'A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal.' " ' " (*Ibid.*)  In this case, plaintiffs contend that the preliminary injunction was mandatory; the Gurneys contend that it was prohibitory. Because our decision in this case would be the same regardless of which standard of review applied, we need not resolve this dispute.

### B.     The Operating and Employment Agreements

The key question in this case is whether the Gurneys retained the right, despite their termination from employment as CEO's, to continue managing the Company's day-to-day operations.  Our answer to that question is no.  The operating agreement reserves to the board—by majority, and in some cases unanimous, vote—the authority to manage the Company's affairs.  In context, the language in the operating agreement authorizing the Gurneys to manage the Company without the approval of the other board members serves as an accommodation to the Gurneys to exercise authority as CEO's, not as an irrevocable grant to continue managing the Company indefinitely.

9

### 1. Termination Under the Employment Agreements

Under the terms of the employment agreements, the Company was entitled to terminate the Gurneys' employment at any time for good cause. In addition, the employment agreements provided that "[t]he Company may terminate [the Gurneys'] employment without [g]ood [c]ause at any time after the third anniversary of the date of this [a]greement on [30] . . . days' advance written notice." The board's decision to fire the Gurneys occurred in December 2016, almost four years after the employment agreements were signed. Consequently, we agree with plaintiffs' contention that the employment agreements provide no basis for a preliminary injunction. (In any case, the Gurneys do not so contend.) Even if the Gurneys are correct that there was no good cause for their firing, the only difference between a termination with or without cause is whether the Gurneys would be entitled to 30 days' notice before their termination.

### 2. The Gurneys' Rights Under the Operating Agreement

Our conclusion regarding the employment agreements is insufficient to decide this case, however. The operating agreement includes a provision stating that, "without the approval of all [m]anagers, the Gurneys may [among other powers]: [¶] . . . manage the day-to-day business and affairs of the Company consistent with past practice of the Gurneys (except as otherwise restricted in this [a]greement)." The Gurneys contend that this provision is a blanket grant of authority to control the operations of the Company, regardless of the wishes of the majority owners, regardless of whether or not the Gurneys continued to be employed under the employment agreements, and thus, apparently, regardless of whether there is cause for firing them. We disagree. The Gurneys misinterpret

10

the language of the operating agreement itself and its connection with the Gurneys' employment agreements.

The provision regarding the management of day-to-day operations must be understood in the context of the operating agreement as a whole. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245 ["We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation."]; Civ. Code, § 1641.) In this case, the relevant language is found in the section describing the circumstances in which the board may make decisions by majority or unanimous vote. The operating agreement provides that "[a]ll actions by the [b]oard . . . shall require the affirmative vote of a majority of the [m]anagers, except for such actions as to which a greater than majority vote may be required pursuant to the provisions of the [a]ct or this [a]greement."

The operating agreement then goes on to list a number of exceptions for which unanimous approval is required. The first of these exceptions is for any action involving "[o]perating the Company and its [s]ubsidiaries other than as a television production company in the ordinary course of business consistent with past practice of the Gurneys, the Company's five[-]year forecasts and the [b]udget." In other words, the Company may not deviate from its prior way of doing business without unanimous board approval. The same section of the operating agreement then continues: "except that, without the approval of all [m]anagers, the Gurneys may:

(i)     manage the day-to-day business and affairs of the Company consistent with past practice of the Gurneys (except as otherwise restricted in this [a]greement);

(ii)    hire and fire employees other than the chief financial officer;

(iii)   decide which productions are sold, to whom, and upon what terms . . . ;

11

(iv)     spend up to $500,000 on development in [f]iscal [p]eriod 2014 and each [f]iscal [p]eriod forward;

(v)     introduce new business streams to the Company, including merchandising and music rights;

(vi)    utilize the Company's resources to maximize profits;

(vii)   deploy employees of the Company in their sole discretion"; along with a few other similar functions.

Thus, in general, the board may make decisions by majority vote, with the exception that some decisions require unanimity. The Gurneys' authority over the day-to-day operations of the Company is an exception to the exception. It describes instances in which the Gurneys may operate autonomously. Within the operating agreement these exceptions serve a clear role: They relieve the Gurneys, when acting in their role as joint CEO's of the Company, from needing to seek the approval of the other board members for every decision that might represent a departure in some small way from their prior course of business. Presumably, neither the Gurneys nor the other members of the board wished to become bogged down in constant votes over minor matters.

The exceptions to the exception did not grant the Gurneys lifetime jobs as managers of the Company. If the Gurneys were removed as CEO's, these exceptions would no longer have any practical effect. At that point, the Gurneys would no longer be operating the Company, and so they would no longer need an exemption from the unanimity requirement to perform the specified job functions.

12

### 3. The Operating Agreement Interpreted in Broader Context

As we have seen, the operating agreement, even when interpreted on its own, does not grant the Gurneys authority to manage the Company's day-to-day operations indefinitely. If there could be any doubt about the Gurneys' rights under the operating agreement, it is dispelled when the operating agreement is considered in light of the employment agreements. The Gurneys signed their employment agreements on the same day that they signed the operating agreement, and the operating agreement explicitly refers to the termination provisions of the employment agreements. Thus, the section of the operating agreement describing actions that require unanimous board approval states that unanimity is required for "[f]iring any senior executive, other than the Gurneys (whose employment may be terminated in accordance with their [e]mployment [a]greements)."[2]

The employment agreements described in detail the circumstances under which the Gurneys' employment could be terminated. In addition to setting out time frames during which the Gurneys could be terminated with or without cause, the employment agreements explained exactly what would constitute good cause. They also spelled out the procedure the board must follow, including allowing the Gurneys an opportunity to respond to the evidence against them. It would be unimaginable for ITV and the Gurneys to go to this much trouble to describe the procedures surrounding the Gurneys' termination, if they intended that the Gurneys would continue to "manage the day-to-day business and affairs of the Company," "hire and fire

---

[2] This reference in the operating agreement to the termination of the Gurneys' employment shows that it is proper to interpret the operating agreement in light of the employment agreements in spite of the integration clause in the operating agreement.

13

employees," and exercise other functions ordinarily reserved for CEO's, even after they were removed from those positions.

Furthermore, the operating agreement must be interpreted in light of common understandings in corporate law. Although the Company was established as a limited liability company rather than as a corporation, we interpret the establishment of a formal board as a choice by the Company to organize itself according to the ordinary rules of a board of directors. (See Friedman et al., Cal. Practice Guide: Corporations (The Rutter Group 2017) ¶ 2:36.18, p. 2-16.) Ordinarily, a majority shareholder who has the authority to appoint a majority of the board of directors may make decisions despite the objection of a minority shareholder. If the Gurneys' interpretation were correct, that rule would be flipped on its head, with essentially no recourse for the majority to assert its authority. Under their interpretation, the Gurneys could never be removed from managing the Company, regardless of any bad behavior on their part or the terms of their employment. Even if the Gurneys had already breached their duty of loyalty by entering into a self-dealing transaction to benefit themselves at the expense of the Company and ITV, the remaining board members would have no means of preventing the Gurneys from continuing indefinitely to operate the Company, except by dissolving the Company.

If the parties intended the operating agreement to grant the Gurneys, as minority shareholders, this much control regardless of the wishes of the majority shareholder, we would expect to find such authority granted prominently and unequivocally in the text of the document. Instead, the language that the Gurneys rely on appears as an exception to a rule requiring unanimous approval of board actions.

Our conclusion that the operating agreement does not give the Gurneys this unchecked authority does not render the Gurneys powerless. Although the Gurneys lost the right to manage the day-to-day operations of the Company when the

14

majority of the board voted to remove them as CEO's, they retained their rights as board members. This included the ability to veto proposed actions requiring unanimous board approval.

Furthermore, as board members, the Gurneys retained the right to visit and inspect the Company's properties, books, and records, and to speak with the Company's officers regarding the Company's affairs, finances, and accounts. We perceive no error in the trial court's grant of a preliminary injunction in favor of the Gurneys with respect to these matters.

The trial court's order granting the injunction depended on its interpretation of the operating agreement as granting the Gurneys authority to manage the day-to-day affairs of the Company regardless of whether they continued to be employed as CEO's. Because the trial court erred in its interpretation of a question of law, its grant of the injunction constituted an abuse of discretion, and we must reverse.

**DISPOSITION**

We reverse the order granting the preliminary injunction to the extent that the injunction reinstates the Gurneys to exercise the functions described in section 5.7(a)(i) - (ix) of the operating agreement, including the day-to-day management of the Company.  In all other respects, the trial court's order granting the preliminary injunction is affirmed.  Appellants are awarded their costs on appeal.

CERTIFIED FOR PUBLICATION.


ROTHSCHILD, P. J.

We concur:



JOHNSON, J.



LUI, J.



16