Filed 5/28/21  Williams v. Petrosian CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WILBUR WILLIAMS, JR., et al.,<br><br>        Plaintiffs and Appellants,<br><br>        v.<br><br>SEVANA PETROSIAN et al.,<br><br>        Defendants and Respondents. | B307439<br><br>(Los Angeles County<br> Super. Ct. No. 20STCV14137)<br><br>ORDER MODIFYING OPINION<br><br>(NO CHANGE IN THE APPELLATE JUDGMENT) |

THE COURT:

The above-entitled opinion filed on May 14, 2021 is modified as follows:

On page 18, in the first sentence of the third paragraph, replace the word "the" between "had" and "right" with the word "no" so the sentence reads:  "There was also substantial evidence Williams had no right after termination of the management agreements to use the equipment, phone lines, website, and intellectual property of Sev Laser."

There is no change in the appellate judgment.

PERLUSS, P. J.        SEGAL, J.        FEUER, J.

Filed 5/14/21  Williams v. Petrosian CA2/7 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WILBUR WILLIAMS, JR., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>SEVANA PETROSIAN et al.,<br><br>    Defendants and Respondents. | B307439<br><br>(Los Angeles County<br> Super. Ct. No. 20STCV14137) |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.

Nick A. Alden for Plaintiffs and Appellants.

Buchalter, Robert Collings Little and Michael B. Fisher for Defendants and Respondents.

_____

Wilbur Williams, Jr., M.D., and his professional corporation Wilbur Williams, M.D., Inc. (the Group; collectively, the Williams plaintiffs) appeal from an order denying their motion for a preliminary injunction. Williams practiced laser hair removal at 10 medical spas operated by Petrosian Esthetic Enterprises, LLC (Petrosian Esthetic) and its managing member Sevana Petrosian. After the parties terminated their relationship, the Williams plaintiffs filed this action for embezzlement, breach of contract, and related claims against Petrosian, Petrosian Esthetic, and Petrosian's business partner Salina Ranjbar (collectively, the Petrosian defendants). The Williams plaintiffs then filed a motion for a preliminary injunction, seeking to enjoin Petrosian from denying Williams access to the medical spas; to compel Petrosian to transfer the spas' leases, telephone lines, and website to the Group; and to require Petrosian to return $2.2 million allegedly embezzled from the Group's bank accounts. On appeal, the Williams plaintiffs contend the trial court erred in denying a preliminary injunction, arguing the trial court abused its discretion in finding neither irreparable harm nor a likelihood of success on the merits. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Management Agreements and Operation of the Sev Laser Medical Spas*[1]

Williams is a vascular surgeon and sole shareholder of the Group. Williams was 83 years old when this action was filed.

---

[1]  The background facts are taken from the declarations and exhibits submitted by the parties in connection with the Williams

Petrosian has been in the business of laser hair removal and aesthetic skincare since 2010, and in 2013 she formed Petrosian Esthetic and became its managing member. Prior to her dealings with Williams, Petrosian operated two laser hair removal medical spas (med-spas) in West Hollywood and Glendale under the business name "SEV Laser," which Petrosian registered as a trademark in 2012. Petrosian registered the website www.sevlaser.com in September 2013, and she obtained phone numbers for the Glendale and West Hollywood med-spas before April 2014. Because laser hair removal is a medical procedure subject to California regulations that require a medical practice to be directed by a licensed physician, Petrosian initially affiliated with Kenneth Thomas, M.D. to provide medical services at the med-spas.

On April 12, 2014 Petrosian Esthetic and the Group executed a management services agreement (management agreement) for the Group to control "the practice of medicine and all decisions related to the practice of medicine" (the "Practice") at the Glendale and West Hollywood med-spas, and for Petrosian Esthetic to provide facilities and non-medical management services to the Group.

Petrosian Esthetic would be the "sole and exclusive provider of all non-medical business management, information management, clinical support and personnel, equipment and supplies as are reasonably necessary for the day-to-day administration, operation and non-medical management of the [p]ractice." The management agreement provided, "[Petrosian

plaintiffs' motion for preliminary injunction. We note where the facts are in dispute.

3

Esthetic] shall provide and maintain all furnishings, fixtures and equipment used in the Practice, including but not limited to the lasers used in the Practice." Further, "[Petrosian Esthetic] has the legal right to occupy the space occupied by the Practice . . . and grants to [the Group] the right to use the Premises for the Practice for as long as this Agreement remains in effect (the 'Sublease')."

Petrosian Esthetic was also responsible for all collections, banking, bookkeeping, and accounting. Under the management agreement, Petrosian Esthetic would collect "all payments for services rendered by the Practice" and deposit them into a "Group Operating Account" belonging to the Group. Petrosian Esthetic was authorized "[t]o sign checks, drafts, bank notes or other instruments on behalf of the Group, and to make withdrawals from the Group Operating Account for payment specified in [the] Agreement"; however, Petrosian was required "[t]o transfer, no less frequently than monthly, amounts remaining in the Group Operating Account after payment of all items required to be paid hereunder . . . to a separate account . . . over which [Petrosian Esthetic] has no authority."

In consideration of its services under the management agreement, Petrosian Esthetic was entitled to receive "its actual out-of-pocket costs in providing its services, plus an amount equal to 15% of such amount . . . ." The agreement included an acknowledgment that Petrosian Esthetic "may operate an aesthetic skincare business at the premises also occupied by Group hereunder," but "any costs attributable to [Petrosian Esthetic's] own business shall not be included in the costs used to determine the Management Fee, which costs shall be limited to

4

the costs of providing administrative services for the Group's Practice."

In 2017 and 2018 Petrosian opened eight additional med-spas in California.  For each new location, a separate limited liability company was formed as the owner and management company for that location, and each company then contracted with the Group to provide medical services and subcontracted with Petrosian Esthetic to provide management services to the Group.  Each of the management agreements for the new locations contained the same material terms as the parties' initial management agreement.  Williams was not a member of and did not invest in the new location management companies.

B.     *Termination of the Management Agreements*

In January 2019 Williams received a 2018 Internal Revenue Service form 1099-K (form 1099-K) from Vantiv ECommerce, LLC (Vantiv), a merchant services company that processed credit card payments for the Group.  The form indicated the Group received credit card income of $1.3 million in 2018,[2] but, according to Williams, he only received $145,000 that year, which Petrosian represented was the Group's net profit after payment of expenses and management fees.  Williams testified he began to have difficulties with Petrosian when she refused to give his accountant Leila Aquino the financial records that Aquino needed to prepare the Group's 2018 profit and loss statement and Internal Revenue Service W-2 forms for its employees.  Williams's relationship with Petrosian reached a

---

[2]     For simplicity, we have rounded the million-dollar amounts.

5

"boiling point" in January 2020 when he received Vantiv's 2019 form 1099-K showing credit card income of $7.5 million in 2019, although he received only $155,000 as the Group's purported net profit.

On February 17, 2020 Williams, accompanied by his wife, son, Aquino, and attorney Nick Alden, met with Petrosian, Ranjbar, and Petrosian Esthetic's attorney to discuss Williams's contention he had not received all the profits to which he was entitled under the management agreements. Ranjbar asserted Williams had been paid everything he was owed. On March 13, 2020 the parties met again and mutually agreed to terminate the management agreements after the close of business on April 30, 2020.

C.     *The Complaint and Motion for Preliminary Injunction*

The Williams plaintiffs filed this action on April 13, 2020. In the operative first amended complaint, they asserted 10 causes of action against the Petrosian defendants and the management companies for the eight additional med-spa locations: (1) declaratory relief; (2) request for accounting; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) breach of fiduciary duties; (6) fraud; (7) embezzlement; (8) conversion; (9) violation of Business and Professions Code section 17200 et seq.; and (10) elder abuse. The Williams plaintiffs alleged the Petrosian defendants withdrew millions of dollars of the Group's income from the Group operating accounts from 2017 until the first quarter of 2020 and transferred the funds into the Petrosian defendants' personal accounts and used the Group's funds for their own benefit. The Williams plaintiffs also alleged the Petrosian defendants breached the management

6

agreements by failing, prior to 2018, to deposit income from the med-spas into the Group's operating accounts.

On April 23, 2020 the Williams plaintiffs filed an ex parte application for a temporary restraining order and order to show cause for a preliminary injunction, which the superior court[3] heard and denied the next day.  On April 30 they filed another ex parte application seeking the same relief, which the superior court denied on May 1 without prejudice due to their filing a motion for a preliminary injunction in the assigned trial court.[4]

On June 11, 2020 the Williams plaintiffs filed a motion for a preliminary injunction.  They argued that from 2017 through March 30, 2020, the Petrosian defendants embezzled more than $10 million from the Group.  They also asserted the Petrosian defendants breached the management agreements by depositing the Group's income into the Petrosian Esthetic bank account in 2017; charging the Group for all furnishings, fixtures, equipment, and lasers used in the practice; and claiming ownership of the clinics' leases, telephone lines, and website after termination of the management agreements.  The Williams plaintiffs sought an injunction prohibiting the Petrosian defendants from denying Williams and his employees and patients access to the 10 med-

---

[3]    Judge Mitchell Beckloff heard and ruled on the Williams plaintiffs' two ex parte applications for a temporary restraining order.

[4]    Williams appealed from the order denying his second application for a temporary restraining order; however, we dismissed his appeal as moot in light of the trial court's subsequent ruling on his motion for a preliminary injunction. (*Williams v. Petrosian Esthetic Enterprise, LLC* (Sept. 11, 2020, B305926).)

spa locations in California; ordering the Petrosian defendants to redeposit into the Group operating account all funds withdrawn between January 1 and March 31, 2020 (estimated at $2.2 million); ordering the Petrosian defendants to transfer all leases, telephone lines, and the website "sevlaser" to the Group; and ordering the Petrosian defendants to provide Williams all patient and employee files.

### 1.    *The Williams plaintiffs' evidence*

The Williams plaintiffs submitted declarations from Williams, Aquino, and Alden.[5]  Aquino declared she received a copy of the 1099-K forms sent to Williams that showed credit card income of $1.3 million in 2018 and $7.5 million in 2019, but Williams received only $155,000 in profits in 2019.  Aquino asked the Petrosian defendants to send her their financial records so she could prepare the Group's profit and loss statements and issue W-2 forms to the Group's employees, but Petrosian's accountant did not provide the information.  Consequently, the Group was unable to file tax returns for 2018 and 2019.

After Williams severed his relationship with the Petrosian defendants in April 2020, Aquino received Petrosian Esthetic's bank account statements for the period from September 2014 through December 31, 2017.  The statements revealed that during those years Petrosian used Petrosian Esthetic's bank account, rather than a Group operating account, "to deposit the income of the Group and pay the bills."  Petrosian Esthetic's bank statements also revealed that in 2017, the Glendale med-spa

---

[5]    Alden's testimony is cumulative of Aquino's and Williams's testimony, other than Alden's assertion of general legal conclusions.

location earned income in excess of $1.2 million, but the Group received only $24,000 as net profit from that location after payment of expenses and management fees.

Aquino also averred based on her review of the Group's bank statements that the Group received gross income of $3.1 million in 2018;[6] Petrosian withdrew $2.6 million; and Williams was paid $145,000 in net profits. In 2019 the Group received gross income of $10 million; $3.7 million went to pay expenses; the Petrosian defendants withdrew $6 million; and Williams received $155,000 in profits. In the first three months of 2020, the Group's income was $3.1 million; $875,534 went to pay expenses; the Petrosian defendants withdrew $2.2 million (including $728,000 in cash); and Williams received $55,000 in profits. Aquino testified, "Based on my calculations, over the last six (6) years, [d]efendants . . . withdrew more than $10 million from the Group's bank accounts." Aquino testified, without elaboration, "I also found that the equipment of the clinics was leased by the Group and paid for from the Group's bank accounts, in contradiction of the terms of the [management agreement]."

In his declaration, Williams explained that for the first four years of the parties' business relationship the Petrosian defendants deposited the Group's income into Petrosian Esthetic's bank account and used the account to pay expenses, and the Group did not receive any tax forms. Williams accepted the profits distributed to him and "had no idea about the finances

---

[6] Aquino stated the company used two credit card processing companies, but one did not transmit a form 1099-K to Dr. Williams, which explained the discrepancy between Aquino's income calculation of $3.3 million and the $1.3 million shown on the Vantiv form 1099-K.

of the Group." Williams received Petrosian Esthetic's 2017 bank statements for the first time on March 30, 2020 after Alden requested them from Petrosian's attorney. It was only after the parties terminated their relationship that Williams asked Aquino to download the Group bank account statements for 2018 through 2020, at which point he finally understood "the full extent of the fraud perpetrated by [the Petrosian defendants]."

Williams averred Petrosian had never claimed to own the med-spas until February 2020, when she pressured him to retire because of his age. Further, it would have been unlawful for Petrosian to own the practice due to state regulations requiring a medical practice to be physician-owned and controlled. Williams claimed the Group paid the expenses of acquiring the leases, rent, telephone service, and website, but the Petrosian defendants claimed ownership of them after termination of the management agreements.

### 2. *The Petrosian defendants' evidence*

The Petrosian defendants relied on a declaration from Petrosian. She admitted that prior to 2018, Petrosian Esthetic and the management companies for the other med-spa locations "incorrectly deposited the revenue of the locations directly into the management company accounts and paid the expenses of the business, including the [Group's] expenses, from those accounts." However, because deposits into Petrosian Esthetic's bank account included revenues from facilities and businesses unrelated to the Group, "Dr. Williams, or his accountant, would not be able to segregate and calculate revenue, expenses and profits for just the Sev Laser med-spas subject to the Management Service

Agreements with him by reviewing only the Petrosian Esthetic . . . bank account statements."

Petrosian declared that since 2018, all collections for laser hair removal services from the med-spas had been deposited into a Group operating account for each location, as provided in the management agreements. Williams opened the accounts in the name of the Group and had unrestricted access to the accounts. Before the middle of 2019, Williams never requested an accounting or to review the management companies' books and records. The management companies maintained records of all expenses incurred at each facility and utilized an outside accounting firm to prepare a profit and loss statement for each management company.

Neither Petrosian nor anyone at Petrosian Esthetic made cash withdrawals from the Group operating accounts. Rather, "[t]he money withdrawn from the [Group] accounts was used to pay expenses and to reimburse the applicable management company for expenses that it paid pursuant to its management obligations" under the management agreements, including payment for all non-medical personnel, facilities costs, furniture, fixtures, quality assurance, marketing, bookkeeping, and legal services, as well as use of the Sev Laser name. With respect to the $2.2 million allegedly embezzled from the Group operating accounts in January through March 2020, the funds "were used to pay the expenses of the business, including compensation of Williams's nurses and nurse practitioners (approximately 80 persons), the professional corporation's malpractice insurance, the non-professional expenses of the business, as described in the management agreements, and the management fees."

Petrosian averred that after the parties agreed to terminate the management agreements, but before the April 30 termination date, all of the California Sev Laser med-spas were closed in response to government stay-at-home orders related to the COVID-19 pandemic. Effective May 1, 2020, Petrosian entered into new management agreements with a professional corporation owned by another licensed physician, and pursuant to those agreements, the new professional corporation occupied the space at the med-spa locations formerly used by Williams. As of June 1, 2020, all of the California med-spa locations reopened, and the new professional corporation hired all the employees formerly employed by the Williams plaintiffs at those locations.

Petrosian added, "If [d]efendants were to turn over to Dr. Williams the leases and occupancy of the Sev Laser med-spas, along with their phone numbers, website and domain name, [d]efendants would be damaged in the amount of $13,078,000 based upon approximate monthly gross income of the Sev Laser med-spas in California of $900,000 for 12 months, plus the $2.278 million paid in expenses and fees that [Williams] requests to be redeposited in his account."

D.    *The Trial Court Order Denying the Motion for Preliminary Injunction*

After a hearing on August 18, 2020, the trial court[7] denied the motion for a preliminary injunction, finding the Williams plaintiffs failed to show an inadequate remedy at law and that they would suffer irreparable harm absent an injunction. The court concluded all of the Williams plaintiffs' claims could be

---

[7]    Judge Barbara M. Scheper.

compensated by an award of damages, and they did not demonstrate Petrosian would be unable to pay a judgment should they prevail. Further, the Williams plaintiffs failed to show a likelihood of prevailing on the merits because pursuant to the management agreements, Petrosian Esthetic and the affiliated management companies owned and operated all the non-medical aspects of the business, and the Williams plaintiffs had "not met their burden of showing that the Sev Laser med-spas are owned by [them], or that [they] have any legal claims to the property in therein." Rather, the evidence showed the spas were owned by the investors in the limited liability companies formed to own and operate each facility.[8]

The court also found the Williams plaintiffs did not meet their "burden to show that [d]efendants misappropriated any funds or made withdrawals for any purpose other than to pay legitimate management expenses and fees as provided under the Agreements." Aquino's declaration relied on "vague statements and almost no foundation to show how she calculated the amount that [d]efendants purportedly embezzled," and her declaration and the bank records did not show the withdrawals were improper and were not made to pay allowable expenses.

Finally, the trial court found the Williams plaintiffs failed to show the balance of harms weighed in their favor because Williams voluntarily agreed to terminate the management agreements as of April 30, 2020, and thus, the status quo was

---

[8] The trial court found the Williams plaintiffs had shown Williams was entitled to receive patient charts and medical records under the management agreements. However, the court found Petrosian offered to deliver the medical records to Williams but received no response.

13

Petrosian's operation of the med-spas with another physician, and Petrosian testified she would be damaged by an injunction in an amount exceeding $13 million. The court concluded, "To suddenly be forced to turn over all leases, property, and trademarks, would clearly cause severe harm to [Petrosian]."

The Williams plaintiffs timely appealed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

"As its name suggests, a preliminary injunction is an order that is sought by a plaintiff prior to a full adjudication of the merits of its claim. [Citation.] To obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits." (*White v. Davis* (2003) 30 Cal.4th 528, 554 (italics omitted); accord, *Amgen Inc. v. California Correctional Health Care Services* (2020) 47 Cal.App.5th 716, 731.) "Trial courts '"evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued."'" (*Amgen*, at p. 731; accord, *ITV Gurney Holding Inc. v. Gurney* (2017) 18 Cal.App.5th 22, 28-29.)

"'"The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to

14

support an injunction.'"" (*Jamison v. Department of Transportation* (2016) 4 Cal.App.5th 356, 361-362.) Nonetheless, a plaintiff must generally make a prima facie showing of irreparable harm to obtain a preliminary injunction. (*Costa Mesa City Employees Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 305 [plaintiff must "'present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits'"]; *Choice-in-Education League v. Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 422 [for the trial court to exercise its discretion to issue a preliminary injunction, "'[t]he applicant must demonstrate a real threat of immediate and irreparable injury [citations] due to the inadequacy of legal remedies'"]; see *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1352 ["[T]he plaintiff must ordinarily show that the defendant's wrongful acts threaten to cause *irreparable* injuries, ones that cannot be adequately compensated in damages."]; see Code Civ. Proc., § 526, subd. (a) [an injunction may be granted in specified circumstances, including "(2) When it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action" and "(4) When pecuniary compensation would not afford adequate relief"].)

We review a trial court's ruling on a motion for a preliminary injunction for an abuse of discretion. (*Amgen Inc. v. California Correctional Health Care Services, supra*, 47 Cal.App.5th at p. 731; *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1449-1450.) "'A trial court will be found to have abused its discretion only when it has "'exceeded the bounds of reason or contravened the uncontradicted evidence.'"'" (*SB*

15

*Liberty, LLC v. Isla Verde Assn., Inc.* (2013) 217 Cal.App.4th 272, 281.) In reviewing the grant or denial of a preliminary injunction, we do not "resolve conflicts in the evidence, reweigh the evidence, or assess the credibility of witnesses." (*Whyte,* at p. 1450.) "The burden rests with the party challenging a trial court's decision to grant or deny a preliminary injunction to make a clear showing of an abuse of discretion." (*SB Liberty, LLC*, at pp. 280-281.)

"An order *denying* an application for a preliminary injunction may be reversed only if the trial court abused its discretion with respect to *both* the question of success on the merits and the question of irreparable harm." (*Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 1250, 1260 (italics added); accord, *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286-287.) Moreover, where "'"the preliminary injunction mandates an affirmative act that changes the status quo, we scrutinize it even more closely for abuse of discretion. 'The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts. A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal.'"'" (*People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 630; accord, *Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625.)

B.    *The Trial Court Did Not Abuse Its Discretion in Denying the Motion for a Preliminary Injunction*

The Williams plaintiffs contend they demonstrated both irreparable harm and a likelihood of success on the merits and were therefore entitled to an order compelling the Petrosian defendants to return $2.2 million withdrawn from the Group

16

operating accounts in 2020 and to transfer the Sev Laser leases, telephone lines, and Sev Laser website to the Group.[9] The trial court did not abuse its discretion.

1. *The Williams plaintiffs did not show irreparable harm*

"[I]f the plaintiff may be fully compensated by the payment of damages in the event he prevails, then preliminary injunctive relief should be denied." (*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1471; accord, *Pacific Decision Sciences Corp. v. Superior Court* (2004) 121 Cal.App.4th 1100, 1110 ["before a court may issue a nonstatutory injunction . . . it must appear that monetary relief would not afford adequate relief"].) The Williams plaintiffs seek an order to recover $2.2 million they allege the Petrosian defendants embezzled from the Group operating accounts. This is precisely the type of recovery for which they have an adequate remedy at law—payment of damages. The Williams plaintiffs did not present any evidence the Petrosian defendants would not be able to pay a $2.2 million judgment if the Williams plaintiffs were

---

[9] In their reply brief, the Williams plaintiffs contend the Petrosian defendants fraudulently induced Williams to enter into the management agreement by, among other things, falsely telling Williams that Petrosian Esthetic's attorney also represented Williams in the transaction; and the management agreement is void and procedurally and substantively unconscionable. However, the Williams plaintiffs did not raise these arguments in their opening brief, and they are forfeited. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 ["the claim is omitted from the opening brief and thus waived"]; *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7.)

17

to prevail at trial.  Instead, the Williams plaintiffs argue monetary relief is not sufficient because by denying relief, "the trial court in effect allowed [Petrosian] . . . to take over Dr. Williams' Practice, equipment, patients and employees.  At his age, Dr. Williams, an 83-year-old man, cannot do a repeat performance. . . .  Dr. Williams does not want money.  He wants his Practice."  This argument rests on a faulty premise—that the Petrosian defendants' alleged embezzlement denied Williams his right to use the med-spa premises, equipment, website, and intellectual property.  It did not.

Williams admitted in his declaration that he and Petrosian "reach[ed] a mutual agreement to terminate the [management] agreements on May 1, 2020."  Aquino similarly declared that Williams "severed his relationship" with Petrosian.  Williams had no right under the management agreements to practice medicine at the Sev Laser med-spas after termination of the agreements.  The agreements provided to the contrary, Petrosian Esthetic "has the legal right to occupy the space occupied by the Practice . . . and grants to [the] Group the right to use the Premises for the Practice for as long as this Agreement remains in effect . . . ."

There was also substantial evidence Williams had the right after termination of the management agreements to use the equipment, phone lines, website, and intellectual property of Sev Laser.  It was Petrosian that provided the equipment and intellectual property under the agreements.  The agreements stated Petrosian Esthetic "shall provide and maintain all furnishings, fixtures and equipment used in the Practice, including but not limited to the lasers used in the Practice."  And, Petrosian Esthetic was the "sole and exclusive provider of all . . . information management, . . . equipment and supplies as are

18

reasonably necessary for the day-to-day administration, operation and non-medical management" of the med-spas. Further, Petrosian declared and presented documentary evidence she created or acquired the Sev Laser telephones, Internet address, website, and trademarks prior to her affiliation with Williams, and she opened and operated the Sev Laser med-spas in West Hollywood and Glendale while affiliated with a different physician. The Williams plaintiffs cannot point to any evidence they had a right to the equipment and intellectual property after termination of the agreement. Williams's asserted lack of knowledge that Petrosian owned the leases to all the clinics, the telephone lines, and the website does not constitute evidence he had any claim to their use.

By contrast, the Petrosian defendants presented evidence they would be seriously harmed if the trial court transferred the Sev Laser med-spas to Williams and the Group. By the time of the filing of the motion for a preliminary injunction, Petrosian had entered a management agreement with a new physician under which the physician subleased space and operated a medical practice, and an injunction would force the med-spas to close with an estimated $13 million in foregone revenue per year.[10] Moreover, because the Petrosian defendants and their

---

[10] The Williams plaintiffs contend Petrosian is not licensed to practice medicine, and without Williams, Sev Laser's practice violates California regulations against the practice of medicine by non-licensed physicians. However, Williams and Alden declared an affiliation similar to that contemplated under the management agreements complies with California law. Petrosian averred the spas closed before the termination of the Group's affiliation due to the COVID-19 pandemic, and by the

19

affiliates owned the leases, equipment, and website and continued to operate the med-spas, the injunction sought by the Williams plaintiffs """"mandates an affirmative act that changes the status quo . . . [which] is rarely granted, and is subject to stricter review on appeal.""""" (*People ex rel. Herrera v. Stender, supra*, 212 Cal.App.4th at p. 630.) Accordingly, the trial court did not abuse its discretion in finding Williams failed to establish his remedy at law was inadequate and he would suffer irreparable harm absent an injunction. (*White v. Davis, supra*, 30 Cal.4th at p. 554.)

2.  *The Williams plaintiffs did not show a likelihood of success on the merits*

Even if the Williams plaintiffs had made an adequate showing of irreparable harm, the trial court did not abuse its discretion in finding they had not met their burden to show a likelihood of success on the merits. (*Marken v. Santa Monica-Malibu Unified School Dist., supra*, 202 Cal.App.4th 1250 at p. 1260.)

The Williams plaintiffs contend the Petrosian defendants embezzled more than $10 million between 2017 and 2020 by withdrawing from the Group's account (or Petrosian Esthetic's account in 2017) revenue the Group received from its medical practice without paying Williams the net income to which he was

_____

time the spas reopened in June 2020, she had entered into a new management agreement with another physician under which the new medical group had a right to occupy space at the med-spas for its practice. It was the new medical practice that hired Williams's former employees, not Petrosian.

20

entitled.[11]  In their motion for a preliminary injunction (seeking $2.2 million allegedly converted in 2020), the Williams plaintiffs relied on Aquino's testimony setting forth the Petrosian defendants' withdrawals from the Group's operating account and the lesser amount of net income paid to Williams, the Group's 2020 bank statements, and nine checks reflecting deposits into the Petrosian Esthetic account from the Group's operating account in 2019.  Although Aquino opined that based on her calculations the Petrosian defendants over a six year period "withdrew more than $10 million from the Group's bank accounts," none of the evidence submitted with the motion shows that the withdrawals from the Group's accounts were used for anything other than to pay expenses and management fees as provided under the management agreements.

As discussed, the management agreements gave Petrosian Esthetic and the related companies the authority to sign checks on behalf of the Group "and to make withdrawals from the Group Operating Account, for payment specified in [the] Agreement[s] . . . ."  Petrosian Esthetic had the right to collect its "actual out-of-pocket costs in providing its services, plus an amount equal to 15% of such amount . . . ."  The services included "all non-medical business management, information

---

[11]    The Williams plaintiffs also claim the Petrosian defendants breached the management agreements by failing to deposit the Group's practice revenue into the Group's operating account prior to 2018.  Although Petrosian admitted this was true, the Petrosian defendants produced the Petrosian Esthetic bank statements for 2017, and as we will discuss, the Williams plaintiffs did not meet their burden to show the Petrosian defendants used the Group's funds for unauthorized purposes.

21

management, clinical support and personnel, equipment and supplies as are reasonably necessary for the day-to-day administration, operation and non-medical management of the Practice . . . ."

Absent evidence of how the Group's funds were used by Petrosian Esthetic, Aquino's testimony that the Group's gross operating income was significantly greater than the net income paid to Williams is not evidence that any funds were embezzled. Aquino stated as to 2019, that the Group's practice received $10.3 million but only $4.7 million went to pay expenses, payroll, and equipment leases. But Aquino's declaration provides no foundation or supporting documents to show how Aquino calculated the expense amounts. Aquino also avers as to 2020 that only $875,534 of the Group's gross income of $3.1 million went to pay expenses, payroll, rent, and leases on the equipment. Although the Williams plaintiffs submitted the Group's 2020 bank statements, the statements do not show how Aquino calculated the $875,534 purportedly used to pay expenses.

Contrary to Aquino's assertion, Petrosian declared that "[t]he money withdrawn from the [Group] accounts was used to pay expenses and to reimburse the applicable management company for expenses that it paid pursuant to its management obligations," including payment for non-medical personnel, facilities costs, furniture, fixtures, quality assurance, marketing, bookkeeping, and legal services, as well as use of the Sev Laser name by the affiliated companies. According to Petrosian, the funds withdrawn in 2020 also were used to pay approximately 80 nurses and nurse practitioners, malpractice insurance, management fees, and other expenses. The trial court implicitly credited Petrosian's averments over Aquino's. In reviewing the

22

trial court's order, we "do[] not resolve conflicts in the evidence, reweigh the evidence, or assess the credibility of witnesses." (*Whyte v. Schlage Lock Co., supra*, 101 Cal.App.4th at p. 1450.)

The Williams plaintiffs contend they did not have sufficient information to calculate the Group's expenses and assert that "only [d]efendants can answer the question, which withdrawals were allowable expenses and costs." Aquino acknowledged she lacked information to prepare the Group's profit and loss statements, calculate Williams's taxable income, and prepare the medical staffs' W-2 Forms. The fact the Williams plaintiffs did not have sufficient information about the Group's expenses does not absolve them of their burden in the trial court to demonstrate likelihood of success on the merits to obtain preliminary injunctive relief,[12] and on appeal "to make a clear showing of an abuse of discretion." (*SB Liberty, LLC v. Isla Verde Assn., Inc., supra*, 217 Cal.App.4th at pp. 280-281.) The Williams plaintiffs did not meet their burden.[13]

---

[12]    Aquino declared she asked Petrosian Esthetic in early 2019 and 2020 to provide a check registry and information about the Group's employees, and at the termination meeting she asked for unspecified accounting information, but no additional information was provided. The Williams plaintiffs did not produce any evidence they pursued their request for financial information in discovery before filing the motion for a preliminary injunction, and they do not contend the Petrosian defendants failed to comply with any discovery requests for the information.

[13]    The Williams plaintiffs request we take judicial notice of the articles of organization of Petrosian Esthetic and the location management companies; a declaration filed by Petrosian Esthetic's attorney on August 4, 2020 in connection with the

23

## DISPOSITION

The order denying the Williams plaintiffs' motion for a preliminary injunction is affirmed. The Petrosian defendants are to recover their costs on appeal.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

---

Petrosian defendants' motion to compel arbitration; a declaration filed by the attorney on September 22, 2020 (after denial of the preliminary injunction) in connection with the Williams plaintiffs' attorney disqualification motion; and a cashier's check Williams purportedly obtained to post a bond in the event the trial court granted a preliminary injunction. We deny the Williams plaintiffs' request because even if the documents were judicially noticeable (which is questionable as to the cashier's check), they are irrelevant to the appeal. (See *Coyne v. City and County of San Francisco* (2017) 9 Cal.App.5th 1215, 1223, fn. 3 [denying judicial notice as to documents that were not relevant to court's analysis]; *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 ["We also may decline to take judicial notice of matters that are not relevant to dispositive issues on appeal."].)